## Case No. 3,373.

CRAWFORD et al. v. The WILLIAM PENN.

[3 Wash. C. C. 484.] [1]

Circuit Court, D. New Jersey. Oct Term, 1819.

PLEADING AND PROOF — VARIANCE — CONTRACTS WITH ALIEN ENEMY—IN ENEMY'S COUNTRY—DEMURRER—BOTTOMRY.

1. A variance in pleading, which would be fatal at common law, may not be so in courts which proceed according to the civil law; as the rules which govern the former courts, are seldom applicable to proceedings in the latter.

2. The court, proceeding under the civil law, will not allow a party to be surprised by evidence, materially variant from the case stated in the pleadings, but will allow an amendment; yet, if the statement of the case be not such, as can mislead the party, the court will proceed to a decree.

[Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 434. Approved in The Clement, Case No. 2,879.]

3. Contracts made with an alien enemy, are lawful, if made in a trade carried on under license of the government, whether they arise directly, or collaterally, out of such licensed trade; or, if the enemy with whom the contract is made, be in the hostile country by license of the government; or if the contract be a ransom bond.

4. Contracts made by prisoners of war, in the enemy's country, for subsistence, are binding.

5. A demurrer in a case proceeded on, under the civil law, does not prevent the party, who demurred, controverting the facts confessed in the demurrer, and compelling the opposite party to prove them. Rules of plead-

ing, in courts of common law, how far applicable in courts proceeding according to the civil law.

6. The master of an American vessel, in an enemy's country, may hypothecate the vessel, for money advanced to return to the United States; though the original voyage was broken up by capture and the compulsory sale of the cargo.

[Cited in The Hunter, Case No. 6,904.]

7. In a libel on a bottomry bond, the libellant is always expected to prove, by other evidence than the bond, that the money was lent, and that the repairs were made, and materials were furnished, to the amount claimed; and that they were necessary to enable the vessel to perform the voyage, or for her safety; and that the money could not be otherwise obtained. He should exhibit an account of the items, for which the funds were expended, with the usual proof, that the court may judge of their necessity.

[Cited in The William & Emmeline, Case No. 17,687; The Bridgewater, Id. 1,865; Nippert v. The Williams, 39 Fed. 826.]

In this case, which was heard at April term, 1815, on plea, replication, and demurrer—see Pet. C. C. 106 [Case No. 3,372]—the court overruled the plea, and ordered the respondent to answer the libel. The respondent afterwards filed a number of pleas; but the third gave rise to the principal subject of controversy. This plea stated, that, at the time of the making and executing the said supposed instrument of hypothecation, in the libel mentioned, the libellants were aliens, born in foreign parts, out of the allegiance of the United States, and within the allegiance of a foreign state, viz. the United Kingdom of Great Britain and Ireland, and not citizens of the United States, by naturalization, or otherwise; and that, at the same time, the said claimant, owner of the said ship, was a citizen of the United States, resident within the same; and that the said master was also a citizen of the United States—and that, at the time when the said bond was executed, there existed open and public war between the said United States, and the said United Kingdom of Great Britain and Ireland; and that the said contract being made between alien enemies, the same was void, &c. To this plea, the libellants replied, in substance, the former plea, replication, demurrer, order, and decree of this court; concluding with an averment, that the matters contained in the former plea, and in the said third plea, to which this replication is put in, are the same, and not different; and that, by reason of the proceedings aforesaid, the respondent is barred from denying the validity of the said contract of hypothecation. Upon this plea, and replication, and others of minor importance, the case was argued at the last term, and it was contended by the respondent's counsel:—1. That it now appeared by the evidence, that the William Penn was not employed by the two governments, as a cartel; nor did she sail under a flag of truce. 2. The libel charges, that the hypothecation bond was given for a loan of money upon the ship, her tackle, and freight;

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq.]

whereas it appeared, upon the face of the bond, that it was given on the ship and tackle only; and the evidence shows, that it was not for a loan of money, but for repairs made, and materials furnished, by the libellants, as ship carpenters. These variances, the counsel insisted, were fatal to the plaintiff's recovery. 2 Brown, Civ. & Adm. Law, 361; 1 Burrows, 369. 3. That the admission of the facts stated in the former replication, by the demurrer to it, does not preclude the respondent from now denying them, either by plea or answer. Coop. Eq. Pl. 321; Mitf. Eq. Pl. 239, 240, 244; 3 P. Wms. 94; 1 Atk. 450; 2 Atk. 284; 4. That all contracts with an enemy, in time of war, are void. Marsh. 741, 756; The Hoop, 1 C. Rob. Adm. 165; The Julia, [8 Cranch (12 U. S.) 181], and other cases decided in the supreme court of the United States. 5. That the bond is void, being for advances on a voyage different from the original voyage. To this, it was answered, that the same strict rules of pleading, which govern courts of common law, do not prevail in courts proceeding according to the forms of the civil law; and that variances, unless material to the real justice of the case, are disregarded by the latter courts. 6. That the former admission, that this ship was a cartel, cannot now be retracted. 7. That though she were not a cartel, still this hypothecation was given under such circumstances of necessity, as will render it an exception from the general rule, which renders void all contracts made with an enemy; and the case was resembled to that of a ransom bond. 1 Ld. Raym. 282; 1 Salk. 46; 3 Burrows, 1734; 2 Doug. 698.

R. Stockton and M'Kean, for libellants.
Griffith & Cox, for respondent.

WASHINGTON, Circuit Justice. This is a libel founded upon a bottomry bond, executed on the 13th of April 1813, at Jamaica, by the master of the ship William Penn; on the ship, her tackle, and apparel, for the necessary repairs and outfit of the ship; to enable her to perform her voyage from that island to the United States. The libel states, that the libellants did, on the day above mentioned, at Port Royal, in the island of Jamaica, lend on bottomry, on the said ship, her freight, tackle, and apparel, to the master of the said ship, £1,370 8s. 4d., current money of Jamaica; the said port being a foreign port; and none of the owners of the said ship being at or near the same; the said captain being otherwise unable to procure the necessary moneys, to refit and victual the said ship, to complete his intended voyage, &c. &c.; a copy of which bond is annexed to the libel, as part thereof, &c. To this libel, ten distinct pleas have been filed; some of which, with the replications to them, have given rise to the questions which the court is now called upon to decide; and

which may be comprised under the following heads: (1) Whether there is such a variance between the libel and the bottomry bond, as ought to prevent a decree passing in favour of the libellants? (2) Whether the contract, being made with alien enemies, is void? (3) Whether the bond is void, upon the ground that the advances were made, not to enable the master to complete his original voyage, which was to Lisbon, but to return to the United States, under a new contract to bring home American prisoners; as appears from the pleadings and the evidence to have been the case?

1. That the variances pointed out exist, is unquestionable; and in an action at common law, it may be admitted, they would be fatal. But the court cannot so easily admit the application of common law rules, to cases existing in courts proceeding according to the forms of the civil law. To use an expression of Mr. Justice Story, in delivering the opinion of the supreme court, in the case of The Adeline, 9 Cranch [13 U. S.] 285, "no proceedings can be more unlike, than those in the courts of common law and admiralty." In the former, a variance between a written instrument on which the action is founded, as set out in the declaration, and the instrument itself, though a profert of it is made; may be taken advantage of upon oyer, or at the trial. But in the latter, the materiality of the variance to the opposite party, is the only ground upon which an objection can be founded. It is admitted, that the respondent ought to be informed, by the libel, of the nature of the demand to which he is to answer, so as to put it in his power to meet it fairly and fully. If the libel should not state the case with sufficient certainty, the court will not suffer the respondent to be surprised, by a case different from that alleged, but will, as a matter of course, authorize amendments to be made, so as to remove the objection. But if either party has made a mistake in setting out his case, and yet not such as could mislead the other party; the court will proceed to make a decree, notwithstanding the variance. Such is the present case. The libel claims the freight as hypothecated contrary to the tenor of the bond. But then the bond itself is made part of the libel, and is referred to as the foundation of the hypothecation; and by this, the respondent was apprized that the freight was not hypothecated, and could not be demanded; and he must have perceived, that the mention of the freight, was a mistake of the proctor who drew the libel. As to the other variance, it is equally immaterial to the real merits of the controversy; nevertheless, the libellants will be permitted to amend this libel, if they desire it, so as to produce a more exact correspondence between it and the case they mean to prove.

2. This is the important question in the cause. But before we examine it, it will be proper to notice an argument of the libel-

lants' counsel, intended to prove, that the consideration of this point, is precluded by the decision of the court at the former hearing; which overruled the plea of alien enemy, and ordered the defendant to answer the libel. We understand the argument to be, that the demurrer to the replication, which asserted that the William Penn was employed as a cartel, and sailed under the protection of a flag of truce, admitted that fact; and that the respondent is not now at liberty to controvert it, and again to rely upon the plea of alien enemy. To this argument, the court cannot accede, even if that were the case now before it for decision. According to the practice of the civil law courts, a plea, whether dilatory or peremptory, is merely intended to put an end to the cause at an early stage of it; to avoid the expense and delay of going at large into it, if the court should be of opinion, that the matter pleaded is sufficient to produce that effect. But the opinion of the court, upon admissions of facts implied from the pleadings, will not prevent the party thus making the admission, for the purpose of obtaining a decision upon the law arising out of it, from controverting the same fact, and compelling the other party to prove it. This doctrine is exemplified, in the every-day practice of the court of chancery. If the defendant file a plea in bar, and the plaintiff set it down for argument, he necessarily admits the truth of the plea; as much so, as if he had demurred to it; for otherwise, the legal effect of the matter pleaded could not be decided. And yet, if the plea be allowed by the court, the plaintiff may, notwithstanding his implied admission, reply to the plea, and deny the truth of the facts contained in it, and put the defendant to establish them by proof. Solicitor's Guide, 243, 244, 235; Gilb. 184; Coop. Eq. Pl. 232. The reason of the case just stated, applies with equal force to the present. Nothing is more calculated to lead to error, than an indiscriminate application of the rules which prevail in courts of common law, to courts proceeding according to the forms of the civil law. A demurrer, for instance, in the former, is in chief, and is a perpetual bar, if judgment be against the party demurring; but if a defendant in chancery demur, and it is overruled, he may afterwards insist upon the same thing by his answer. Dormer v. Fortescue, 2 Atk. 284. It has been thought proper to make these general observations respecting the practice of the court of equity, that the objection, so much relied upon by the libellants' counsel, may be put to rest. But the present case steers perfectly clear of the objection, and would do so, even in a court of common law. The matter of the plea, which, with the replication, formed the subject of inquiry at the former hearing of this case, was perfectly distinct from that contained in the third plea, now under consideration. That was a dilatory plea, to the disability of the libellants to sue, upon the

fact asserted in the plea,—that they were, at the time the suit was brought, and when the plea was filed, alien enemies. This is a plea in bar, founded upon the matter set out in the plea, that, at the time the contract was entered into, the libellants were alien enemies; and, for that reason, the contract was void. The facts stated in the two pleas were, therefore, altogether different. This opinion brings into view the replication of the libellants to the third plea, which asserts the invalidity of the bottomry bond, on the ground that the contract was made with alien enemies. The replication, instead of avoiding the bar, by alleging that the trading was licensed, on account of the sanctity attached to a cartel; or by stating any other facts, to withdraw the case from the operation of the general rule of law, relied upon in the plea; rests altogether upon the effect of the demurrer to the replication, put into the plea originally, and the decision of the court upon it, as sufficient to preclude the defendant from putting in this plea. But, as the court has just decided that the respondent is not precluded from relying upon this plea, it will be incumbent on the libellant, if he would avoid the force of it, to withdraw this replication, and to file another, setting forth such facts as he may think sufficient, in point of law, if they exist, to withdraw the case from the operation of the general rule. Upon the present pleadings, the decree must be in favour of the respondent on the third plea. But the libellant, if he desires it, will be permitted to amend; and as the pleadings on both sides, are drawn without a very strict observance of admiralty practice, it may be best, that the pleadings should be so constructed on both sides, as to present, in the most simple form, the points intended to be controverted. This will probably be most effectually accomplished, by filing a new libel, setting forth the whole case, to which pleas may be filed, stating the objections to the recovery.

Having disposed of these preliminary points, we come to the consideration of the main question,—whether this contract, being made with an enemy, is void? The general rule is admitted, that contracts, made with an alien enemy, are void. Such is the law of nations, and of most, if not of all, the civilized nations of the world. The English and American decisions are positive in the establishment of this doctrine. But to this, as to most general rules, there are exceptions. Contracts, made with an enemy, under the license of the government, are valid; and may, in certain cases, be enforced even during the war; and that too, whether the contract arose directly or collaterally out of such licensed trade. So, if the enemy, with whom the contract is made, be in the hostile country by license of that government. So, a ransom bond, given to an enemy, to procure the discharge of the property and the person of the captured, we hold to be valid. Such was decided to be the law of England, in

the case of Ricord v. Bettenham, 3 Burrows, 1734, and in Cornu v. Blackburne, 2 Doug. 641. Such, too, is the law of other countries on the continent of Europe. We are aware of the decision in the case of Anthon v. Fisher, in the exchequer, which is to the contrary (2 Doug. 649, note); but never having met with a full report of the case, it is not easy to understand what were the particular reasons which led to that decision. How far it may have been influenced by the statute, making it criminal to give a ransom bond, which had passed prior to this decision, but after the ransom, is not clear. At all events, it was a case decided long after our Declaration of Independence, and even after the treaty of peace; and is therefore not to be considered as authority in the courts of this country, so as to overrule the decision in Ricord v. Bettenham, which was made in 1765.

There are other cases, which are considered as exceptions, even in England, where the general rule is upheld with considerable rigour, founded upon the peculiar necessity of the case. The case of The Madonna delle Gracie, 4 C. Rob. Adm. 195, is, to say the least of it, a very liberal relaxation of the general rule. It would seem, from the modern cases, that contracts, made by prisoners of war in the enemy's country, have been supported. In the case of Sparenburgh v. Bannatyne, 1 Bos. & P. 163, Chief Justice Eyre observes, that "modern civilization has introduced great qualifications to soften the rigours of war; and allows a degree of intercourse with enemies, and particularly with prisoners of war; which can hardly be carried on without the aid of our courts of justice." The other judges agree with him. Recoveries at nisi prius, we understand, are common, upon contracts made with the enemy by prisoners of war, upon parol, for their subsistence. Willison v. Patteson (Easter Term, 1817, C. P.) 7 Taunt. 439. The case of Antoine v. Morshead, 6 Taunt. 237, is that of a bill of exchange, drawn on England, in the enemy's country, by one British subject, a prisoner of war, in favour of another British subject, also a prisoner of war, and by him endorsed to an alien enemy; in which case the contract was supported. It is true, that the court seem to rely very much upon the circumstance, that the original contract was between British subjects. But it is impossible not to perceive, that the right of the alien enemy to recover upon such bill, after the return of peace, was founded upon a new contract with an alien enemy, by virtue of the endorsement; and that, if in all cases, a bill drawn by one subject in favour of another, may pass, by endorsement, into the hands of an alien enemy, the general rule of law might be indirectly subverted. We understand this case, therefore, as going the full length of establishing an exception to the general rule, in favour of prisoners of war, in the country of the enemy, contracting for necessaries. Chief Justice Gibbs seems to place it upon this ground; by saying, that, "if the objection could be supported, to its full extent, many of our miserable fellow subjects, detained in France, must have starved." The case of Daubuz v. Morshead, Id. 332, is a case like the former, in principle.

The principle on which this doctrine is founded, is strongly supported by the decision of the supreme court of the United States, in the case of Haller v. Jenks, 3 Cranch [7 U. S.] 210. That was the case of an insurance upon a cargo, purchased at St. Domingo, by the owner of an American vessel, which had been forced into that island by distress, and was compelled by the government to dispose of her outward cargo, with the proceeds of which the cargo insured was purchased. The objection made to the recovery was, that the cargo so insured, was purchased contrary to the express provisions of the non-intercourse law; and that the trade, being therefore illicit, the policy was void. But the supreme court maintained the validity of the contract, upon the ground, that the vessel having been forced into the island by a cause which could not be resisted, and the owner having been compelled by the government of the country to dispose of his cargo, it was not a trading contrary to the spirit of the law, to invest the proceeds in a return cargo. Now, that was the case of a trading, as expressly prohibited by the municipal laws of the United States, as a trading with the enemy is by the law of nations; and found its justification in a necessity, not imperious and irresistible, but one which was induced by a desire to save property. The owner might have avoided a breach of the law, strictly construed, if he had chosen to abandon his property. But the court was of opinion, that he was not bound to do so, notwithstanding the strong and unqualified expressions of the law. It is difficult to discover a difference, in principle, between that case and the present. In both, the vessel was forced into a forbidden port by a vis major—in both, a voluntary trading was forbidden; and in both, the contract, which would have been void, upon general principles of law, was predicated upon a necessity, no otherwise indispensable, than in order to save property. There is, indeed, this difference between the two cases, which, however, is all on the side of the validity of this contract;—in the former, the master might have brought away his vessel and crew, with no other loss than that of the cargo, and that too, from a nation with which the United States were at peace; whereas, in the latter, the departure of both depended upon the contract now objected to, and that from the country of the enemy. We cannot take leave of the case just referred to, without citing certain expressions of the chief justice, applicable to a case precisely like the present. He ob-

serves, that "even if an actual and general war had existed between this country and France, and the plaintiff had been driven into a French port, and a part of his cargo seized, and he had been permitted by the officers of the port to sell the residue, and to purchase a new cargo; I am of opinion, that it would not have been deemed such a traffic with the enemy, as would vitiate the policy upon such new cargo." Had this hypothetical case been the very case before the court, it would have been directly in point, and would have gone on all fours with the present. It corresponds, however, in principle, so precisely with the main case decided, that the opinion of this learned and highly distinguished judge, is entitled to more than ordinary respect. The ground which the court takes in deciding this case is, that the contract grew out of a real necessity, produced by a state of war, and was itself the offspring of an act of hostility. The vessel was captured as prize of war, libelled as such, and on account of her having a British license on board, was acquitted. She was disabled from availing herself of this discharge, and returning to her own country with her crew, without being repaired and victualled. This could no otherwise be effected, than by hypothecating the vessel for those repairs and outfits. In a moral point of view, therefore, it cannot be said, that this was a voluntary contract. The decision in this case, can never be relied on to sanction contracts with the enemy, under cover of a pretended necessity, or in which there is the slightest tincture of fraud, upon the general rule of law. Upon the whole, then, we are of opinion, that this bottomry bond is not void, on the ground of its being a contract made with the enemy.

3. The next objection is, that this bond is void; because the asserted voyage to the United States to bring home prisoners, was a new voyage; and that the master had no authority to take up money on the security of the vessel, unless it had been necessary to enable him to complete his original voyage. In support of this position, the learned counsel referred to no authority which appears to bear upon it; and it is certainly unsupported by reason, or by any general principles of law. The master is the servant of the owner; and from the nature of his station as such, he has authority to enter into contracts for the employment of the vessel, as well as such as relate to the means of employing her. His duty is to obey the orders of his owner, and to act with fidelity to him, and with a view to his interest. He appears in this character to the world, where it can never be known, by those who transact business with him, what may be his private instructions. The consequences to commerce would be disastrous indeed, if the owner, whose ship is repaired and fitted to perform a voyage by means of advances made in a foreign port, could relieve his property from the security given on it by the

master; by asserting and showing that the voyage, for the performance of which she was refitted, was not the real voyage which the master was instructed to perform. In this case, the vessel was captured, and carried into the enemy's country; and the original voyage to Lisbon was thereby put an end to, by a compulsory sale of the cargo. The vessel was released, but could not leave Jamaica upon any voyage, without considerable expense in refitting and victualling her. What was the master to do? He could have her refitted, by agreeing to hypothecate her as a security for the advances; but he is told, that he cannot give a valid hypothecation, unless he will agree to go to Lisbon, at great expense, and without an object; or will return empty to the United States; although a freight had been offered him, sufficient, perhaps, to cover all her expenses and outfits. Is it possible, that it can lie in the mouth of the owner, who would alone be the victim of such a doctrine, and is benefited by a rejection of it, to urge this as an objection against the validity of the contract? It can only be necessary to state the case, to refute the argument. The truth is, that the authority of the master to hypothecate, is not restricted to necessaries to enable him to complete his original voyage. It extends to the obtaining of supplies necessary for the safety of the vessel, and to enable him to perform any voyage which he is authorized by law to undertake; there being no collusion between him and the lender to injure the owner. That the master, in this case, was authorized, and that it was his duty to return to the United States, under any legal contract intended for the advantage of his owners, is indubitable.

Another objection was taken by the respondent's counsel, to the sufficiency of the evidence to prove the debt for which this security was given, which need not be examined until the final hearing of the cause. It may be sufficient for the present, to observe, that the libellant, upon a bottomry bond, is always expected to prove, by evidence other than the bond itself, that the money was lent, or the repairs made and materials furnished, to the amount for which the vessel is liable;—that they were necessary to enable her to perform her voyage, or for her safety, and could no otherwise be obtained, &c. He ought to exhibit an account of those items, with the usual proofs to support them, that the court may judge whether they were necessary for those purposes; because, unless they were, the master exceeded his authority as such, to bind the property of his owners.

The parties then asked leave to amend the pleadings, which was granted.