## Case No. 13,744.

### The TANGIER.

[2 Lowell, 7.] [1]

District Court, D. Massachusetts. April, 1871.

MARITIME LIEN—ADVANCES—SUBROGATION.

1. One who advances money in good faith, to enable the master of a foreign vessel arriving here to pay the custom-house charges and the wages of his crew, has a privilege against the vessel for these advances.

[Cited in Nippert v. The Williams, 39 Fed. 828, 42 Fed. 542.]

2. To create a privilege on the ship. it is enough that the advances are necessary to free her from debts previously due, which are a charge on the ship

3. If the person making the advances were not himself a material-man, he might yet have a privilege by subrogation to the rights of the seamen and others whose claims he has paid.

[Cited in Nippert v. The Williams, 39 Fed. 828.]

4. The doctrine of subrogation in the admiralty, and the case of The Larch [Case No. 8,085], discussed.

[Cited in Re Low. Case No. 8,558; The J. A. Brown, Id. 7,118; The Sarah J. Weed, Id. 12,350; The J. C. Williams, 15 Fed. 559; The H. E. Willard, 53 Fed. 601.]

The libellants, ship-chandlers of Boston, furnished money to the master of the brig Tangier, of Bangor, to pay off his crew, who had arrived here at the end of a voyage from Savannah, by way of the West Indies; and the money, or most of it, was proved to have been applied to the purposes for which it was borrowed. There was evidence tending to show that Capt. Grant, the master of the vessel, had not followed the instructions of the owners in going to Savannah, and that they had determined to remove him, and had sent one of their number to Boston for that purpose. The vessel was consigned to Messrs. Lewis & Hall, of Boston; and this fact was known to the libellants, but they did not know that one of the owners was here. This owner, Mr. Huckins, had an interview with the master soon after his arrival, and before most of the money had been advanced. though after it had been promised, in which he notified him of his re-

moval; but this, too, was unknown to the libellants, who afterwards went to the custom-house with the master, and entered the vessel and paid the dues, and made the further advances. When the libellants presented the bill to the consignees they referred him to Mr. Huckins, who refused to pay the bill, saying, that the master had been displaced.

The claimants in their answer denied that Capt. Grant was master of the vessel at the dates mentioned in the libel, and alleged that the owners were known to the libellants, and were in good credit in Boston, and that one of the owners was present with ample funds to meet all disbursements, and that the master himself had funds, all which might have been ascertained on due inquiry. That the libellants had already brought an action in the superior court for the county of Suffolk against the master, in which they had summoned the consignees of the cargo as trustees, and another action against the owners, or some of them, in the same court; both of which actions were still pending. There was evidence to sustain the allegations of the credit enjoyed by the owners, and of the previous action brought by the libellants, but not that the libellants knew who the owners were. They made no inquiries excepting of the master. There was some evidence that the master remained in actual command until the cargo was unladen.

J. C. Dodge, for libellants.

We made due and sufficient inquiry of the person whom we had a right to consider the representative of the ship. The Grapeshot, 9 Wall. [76 U. S.] 129. The merchant who furnishes money for supplies, repairs, and other necessaries in a foreign port has the same privilege with the person who makes the repairs or furnishes the supplies, &c. Thomas v. Osborn, 19 How. [60 U. S.] 29; Davis v. Child [Case No. 3,628]. That there was a lien for such necessaries as were furnished in this case, notwithstanding the voyage, or one definite part of it, ended at this port, see The Edmond. Lush. 57; The Vibilia, 1 W. Rob. Adm. 1. The William F. Safford, Lush. 69, shows that we may be subrogated to the privilege of the crew. If the master sailed the vessel on shares, this lien is necessary for our protection. The James Guy, 9 Wall. [76 U. S.] 758.

R. D. Smith, for claimants.

A lien cannot be asserted here, because there was no necessity for the supplies nor for the credit. Pratt v. Reed, 19 How. [60 U. S.] 359. The payment of a debt due for necessaries is very different from advancing money to procure necessaries. Beldon v. Campbell, 6 Exch. 886, explaining Robinson v. Lyall, 7 Price, 592. Here the master had ceased to be the agent of the ship, and could no longer bind it by his contracts. Webb v. Peirce [Case No. 17,320].

---

1 [Reported by Hon. John Lowell, LL. D., District Judge, and here reprinted by permission.]

LOWELL, District Judge. In the case of The A. R. Dunlap [Case No. 513], I expressed the opinion that Pratt v. Reed [supra] must have been decided on its own peculiar facts, which certainly tended strongly to show an exclusive personal credit for the supplies which were furnished to the vessel. In the late case of The Grapeshot, 9 Wall. [76 U. S.] 129, the supreme court have conclusively settled this vexed question, and the lien is now re-established on its ancient foundation, or nearly so. It cannot be doubted that the privilege of the material-man who supplies a foreign ship extends to the creditor who advances money for the purchase of necessaries, as well as to the ship-chandler or mechanic who actually supplies them. Davis v. Child [supra], approved in Thomas v. Osborn, 19 How. [60 U. S.] 29. See acc. The Emily Souder, 17 Wall. [84 U. S.] 667; The Riga, L. R. 3 Adm. & Ecc. 516. And so is the law of England. The Sophie, 1 W. Rob. Adm. 368; The Onni, Lush. 154; The Afina Van Linge, Swab. 515. A distinction, however, is taken by the claimants between the advance of money for necessaries to be furnished, and an advance for the payment of an already existing debt for necessaries. A master, it is said, cannot hypothecate his vessel, excepting for the purpose of helping on her voyage; and such necessity is not presumed to exist in respect to personal debts of the owner or of the master, even though the latter be imprisoned in a foreign port for non-payment of such debts. The Prince George, 4 Moore, P. C. 21; The N. R. Gosfabrick, Swab. 344. This doctrine extends to bottomry bonds as well as to tacit or implied hypothecations. So that, for instance, the necessity of liquidating damages incurred in respect to outward cargo does not authorize the master to give a bottomry bond for the amount, unless the claim would be a lien on the ship by the law of the place where the payment is made; but where there is such a lien, the presumption is against a personal credit, and the bond is well justified. The Vibilia, 1 W. Rob. Adm. 1. So at common law it has been held, that one who has advanced money to the master to pay a debt contracted for towage is a mere volunteer, and cannot maintain an action against the owner. Beldon v. Campbell, 6 Exch. 886. That decision has no very great importance in the admiralty, excepting as it illustrates this point; for, by the civil law, a mere volunteer may maintain an action under like circumstances, though he might not be entitled to subrogation to a privilege. The important difference beween that case and this is, that the towage in the former was a mere contract. If the vessel had been foreign, the rule would have been different. That one who pays my debt upon the request of my authorized agent is a volunteer would be a somewhat remarkable notion. There is no sort of doubt that the master has such authority in respect to such a debt in a foreign port. In Massachusetts, a master may pledge the credit of his owners, who live in New York, for the payment of wages already earned. Stearns v. Doe, 12 Gray, 482. The question in this part of the case is whether a merchant or ship-broker who advances money to pay the crew is a material-man, or is merely a creditor who volunteers to pay an antecedent debt. And I confess myself unable to see any less necessity for the present payment of the crew of a vessel in a foreign port, if their wages are due them there, than for procuring supplies and repairs for the further prosecution of the voyage. And, so far as my examination has extended, the decisions confirm this opinion. In many of the cases, the particular necessities of the ship which have been supplied by the material-man are not set out; but, so far as can be discovered, the cases put money for wages already earned on the footing of necessaries. The Duke of Bedford, 2 Hagg. Adm. 294; The Bombay, The Unity, 3 Hagg. Adm. 148, note. I am aware, of course, that the decision in the case of The Neptune, in a note to which these two last cases are cited, was reversed by the privy council, and rightly, but not on any question of this sort; and these cases are still valid decisions to the point to which I cite them, and I have found none of a different tendency. Then there is the case of The William F. Safford, Lush. 69, cited at the bar, where an American whaling-ship was arrested at Liverpool for a debt for necessaries, and several other similar actions were entered against her, including one on a bottomry bond and one by John Da Costa, of Liverpool, for necessaries, which were wages paid by him to the crew at the request of the master, on account of the ship. Da Costa's claim was ordered to be paid first. "If he had not advanced the money," says the learned judge, "the seamen would have no doubt arrested the ship, and enforced their right to priority of payment." The distinction, therefore, between paying a past debt and contracting a new one ought not to be extended to a payment for wages due in the foreign port, and for which the crew have a present privilege against the ship. It has not been so extended by the courts.

In the present case there is no evidence of any fraud or negligence on the part of the libellants, and there is evidence, though not wholly uncontradicted, that the necessity was real. It appears that the bank check given to the master was actually applied to pay the crew, and that the master was not in fact displaced till after the advances were made, but entered the vessel at the customhouse, and did all the usual work of a master, until several days after this time. Every thing concurs to give the libellants the position of material-men.

The libellants claim a lien upon another

and distinct ground, that of subrogation. It must be admitted that the law of this circuit refuses to the master himself a lien on the ship for his disbursements. See Ex parte Clark [Case No. 2,796], and notes; The Larch [Id. 8,085]. The reasoning in the case of The Larch goes much beyond the decision; and seems to assert, if I do not misunderstand it, that, independently of the general and difficult question, whether the master himself, holding a peculiar and confidential relation to the owners, ought to have a privilege on the ship, however derived, the doctrine of substitution or subrogation would not aid him, because, when he has paid one of the ship's debts, it is paid, and at an end, and that subrogation can never be decreed unless there is some actual outstanding legal title, like a mortgage, upon which to attach it. If that is the meaning of the decision, its adoption would make sad havoc with subrogation. The opinion cites the famous case of Copis v. Middleton, 1 Turn. & R. 224, and one or two others which followed it, as authority for this broad and sweeping destruction of the law of subrogation. In that case, Lord Eldon decided, contrary to the whole current of decisions on analogous subjects, that a surety on bond who paid the debt did not thereby become a specialty creditor of his principal. It was very much like those decisions in which it used to be the fashion to say that an implied promise could not be maritime, and within the jurisdiction of the admiralty. The decision was never approved in England, and was repealed by act of parliament (19 & 20 Vict. c. 97, § 5) about the time that The Larch was decided. Its doctrine never was the law of this country. In the few states of this Union in which the distinction between creditors by bond and creditors by simple contract is or was preserved in the distribution of assets, the doctrine of Copis v. Middleton was not generally admitted. Lidderdale v. Robinson, 12 Wheat. [25 U. S.] 594; Shultz v. Carter, 1 Speer, Eq. 533; Croft v. Moore, 9 Watts, 451; Smith v. Swain, 7 Rich. Eq. 112. So in those states where a judgment has priority, the surety, whether joined in the judgment as a defendant or not, is entitled to the lien. Lathrop's Appeal. 1 Barr [1 Pa. St.] 512; Cottrell's Appeal, 23 Pa. St. (11 Har.) 294; Goodyear v. Watson, 14 Barb. 481; Speiglemyer v. Crawford, 6 Paige, 254; Baily v. Brownfield, 20 Pa. St. (8 Har.) 41. The learned editors of the Leading Cases in Equity (2 White & T. Lead. Cas. Eq. [3d Ed.] pp. 226 et seq.; Id. [4th Ed.] pp. 278 et seq.) in their notes to Aldrich v. Cooper, writing while Copis v. Middleton was, or was supposed to be, still in force there, though they pointed out its discrepancy with other English decisions, say: "In this country, however, the courts proceed on the more liberal principle of regarding payments made by a surety to the creditor as prima facie intended to ad-

vance and not to defeat his rights against the principal." And they support this statement by ample citations.

Besides, the doctrine of that decision, while it lasted, was never applied in England to a case where there was any mortgage, pledge, or lien of any kind to the benefit of which the surety could be substituted, but was confined to the mere case of one paying what the court was pleased to call his own debt. The distinction taken in the opinion of The Larch [supra], between our law and that of Rome,—namely, that the latter by a laudable fiction presumed an assignment, when, in fact, there had been a mere payment, while our law recognizes no such fiction,—cannot be maintained. Our law, in numerous instances, adopts that precise fiction, and subrogates a surety, or other person equitably entitled to that remedy, not only where the debt has been paid, but where the security has been actually discharged, whether by fraud or mistake, or however otherwise. Even at law the right of an insurer to subrogation to a cause of action against a wrong-doer cannot be discharged by the assured on receiving full payment from the wrong-doer. Hart v. Western Railroad Corp., 13 Metc. [Mass.] 99. A mortgage discharged in all due form will be considered assigned when equity requires it; and so in many other well-known cases. The courts of law, equity, admiralty, and bankruptcy, each in its own mode, all recognize subrogation to liens and privileges in a great variety of circumstances analogous to those at bar. I do not, of course, mean to say that a debt may not be extinguished, if such is the true intent of the parties; nor that a mere volunteer is entitled to a privilege; but the evidence here shows an advance, in a foreign port, to one who appeared to be the master of the ship, which excludes both of these considerations.

In trover by the assignees of a bankrupt, the defendant, who held a ship by a bill of sale from the bankrupt that was absolutely void under the registry acts, was permitted to deduct from the value of the vessel the sums he had paid in a foreign port for salvage and wages, as well as certain damages, for which the vessel had been attached for non-fulfilment of a contract of affreightment. Richardson v. Campbell, 5 Barn. & Ald. 196, 203, note. This allowance is put on the ground of lien; and it could have no other basis, because there was no mutual credit between the bankrupt and the defendant, and no right of set-off at that time in trover; so that the lien could avail the defendant only by subrogation. A surety on bond to the government who pays the debt is subrogated to the priority of the sovereign. Hunter v. U. S., 5 Pet. [30 U. S.] 172; Dias v. Bouchaud, 10 Paige, 445; Reg. v. Salter, 1 Hurl. & N. 274. A surety in bankruptcy is subrogated to all the rights of the creditor, and so the creditor may insist on all the ad-

vantages given to the surety. It is usual and good practice in the admiralty, when a ship is under arrest, for one of the parties plaintiff to obtain leave to pay off the crew with full subrogation. The Kammerhevie Rosenkrants, 1 Hagg. Adm. 62; The John Fehrman, 16 Jur. 1122. When such a petition is denied, it is because the owners are not before the court, so that it is improper at that stage of the case to go into the question whether the wages are in fact due. The Adolph, 3 Hagg. Adm. 249. It has been the practice lately in England to require the person who pays the wages to apply to the court before he makes the payment; but such previous authority is not insisted on, as yet, in all cases. The Cornelia Henrietta, L. R. 1 Adm. & Ecc. 51. In this country a bondholder has been rebuked for requiring an assignment from the seamen of their claims, the court saying, that if the bondholder paid the wages, the law would make the assignment, and that he could recover the whole sum for his bond debt and wages, in one libel. The Cabot [Case No. 2,277].

It was not contended that the suits which are pending at common law, and are resisted by the owners or in their interest, can be availed of as a bar. Nor do I understand that the claimants deny that a few of the items, such as the custom-house dues, and the wages of the steward, who still remained on board, would be a charge on the ship, provided the master were still capable of representing the vessel when those moneys were paid. It is impossible, upon the evidence, to say that the master was actually deprived of command so early as the answer represents it; but, if he were, and the owners intrusted him with the duty of entering the vessel and paying off the crew, it will hardly do to say that he was not their agent for those purposes as fully as if they had never removed him at all. If his agency had ceased, the equitable doctrine of subrogation might be invoked. Either way, the libellants must succeed. Decree for libellants for $451.24 and costs.