NIPPERT *et al. v.* THE WILLIAMS.

*(District Court, D. Kentucky. July 16, 1889.)*

1. MARITIME LIENS—ADVANCES OF MONEY.
   Where money necessary to a boat is borrowed by her master in a foreign port where the credit of her owners alone is not sufficient to obtain such money. the lenders have a lien on the boat therefor, whether the claims against the boat paid by such money constitute liens or not.
2. SAME.
   But they have no lien for money advanced directly to the owners of the boat, when they did not understand that such money was to be used in paying claims against the boat.

In Admiralty. On libel for advances.
*Goodloe & Barr*, for libelants.
*Knox & Reed* and *Brown, Humphrey & Davie*, for claimant.

BARR, J. The evidence satisfied me that the sums which were borrowed of the libelants, M. Nippert & Co., by the captain of the Williams on the 11th of December, 1888, and February 12, 1889, were necessary for the boat. The wages due the crew, and the supplies which the boat had obtained on the voyages immediately preceding the 11th of December, 1888, and the 12th of February, 1889, were more than the amounts advanced by the libelants, and I think the payment of these wages and supply bills was absolutely necessary for a continuance of the business of this boat. The weight of the evidence is that, excluding the Williams herself, her owners were without sufficient credit to borrow here the necessary sums to pay off these wages and supply bills, either on the 11th of December, 1888, or February 12, 1889, and that the sums advanced by the libelants at those dates were advanced for the purpose of paying off the wages due the crew of said boat and the supply bills, and such was the understanding of both the libelants and the captain of the boat, except as to the $2,000, which was sent in a draft to the Grand Lake Coal Company. The money which was advanced by the libelants, M. Nippert & Co., was raised by them through the Masonic Savings Bank, by discounting 90-day drafts of the boat, which were drawn on the Grand Lake Coal Company, and made payable to the order of M. Nippert & Co., and indorsed by them. Although the business of libelants is carried on in the name of M. Nippert & Co., M. Nippert is dead, and the only partners are Chris Bosche and Albert Bosche. These drafts, which were signed by John Williams, captain of boat, and one of which was accepted by the Grand Lake Coal Company, by J. B. Williams, state on their face that they were for "wages and supply account of steamer." The amount of the proceeds of these drafts discounted by the Masonic Savings Bank was $6,364.95 for draft dated December 11, 1888, and $8,824.25 for draft dated February 12, 1889. It appears from the evidence that Chris Bosche, one of the firm of M. Nippert & Co., and Capt. John Williams, captain of the boat, went together to the bank where these drafts were discounted, and where the checks for the proceeds of the discounts were given. Mr. Bosche explains his going with Capt. Williams by saying: "I always went with him to get a bill discounted, because Captain Williams was a man of very limited education, and could just barely write his name, and I did the figuring." Mr. Bosche gave checks for the amount of the discount of these drafts to order "proceeds of St'r J. B. Williams' draft or bearer" as to the February 12th draft, and to order "proceeds of draft or bearer" as to the December draft, and neither of them are indorsed. He states, however, that, as to the check of February 12, 1889, he gave to the teller of the bank a deposit ticket for the amount of their supply bill against the boat, amounting to $1,022.50, and the balance was paid in money to the boat's officer, and taken over to the steamer across the river from this city.

As to the amount of money which was drawn out of the Masonic Bank, and taken to the boat on the check dated December 11, 1888, there is some conflict in the testimony. Mr. Bosche states generally that the

money received from the checks actually passed into the hands of Capt. Williams, and that he did not know that any of the money was appropriated to the payment of any purpose other than the necessary running expenses of the boat, and that he only got information the morning he testified, that $2,000 of it had been sent to the Grand Lake Coal Company. Ike Williams, who was the clerk of the boat, whose deposition was taken by Mr. Risher, the mortgagee, says: "I got the $6,500 in December, 1888, at the office of M. Nippert & Co., in cash, and took it down to the boat. The captain sent the $2,000 to Pittsburgh by draft. I gave him the money in cash on the same day I received it, or the next day." But, as against these statements, there is exhibited a draft by the Masonic Savings Bank on the Importers' & Traders' National Bank, New York, dated December 11, 1888, to the order of M. Nippert & Co., or $2,000, which is indorsed by M. Nippert & Co. to the order of Grand Lake Coal Company, and then by Grand Lake Coal Company, by J. B. Williams. This indorsement is in these words, viz.: "Pay to the order of the Grand Lake Coal Company. [Signed] M. NIPPERT & Co.,"—and is proven to be in the handwriting of Mr. Chris Bosche. There is also produced another draft drawn by said bank on its correspondent in New York, (Importers' & Traders' National Bank,) of same date, December 11, 1888, to order of M. Nippert & Co., for $500, and by them indorsed to James Rafferty, and then by Rafferty. This indorsement is also proven to be in the handwriting of Mr. Bosche. Rafferty was a pilot on the Williams, and the books of the boat show that he was paid that sum on account of wages, December 11, 1888. The check of M. Nippert & Co. for the proceeds of the draft dated December 11, 1888, and which was exhibited by the libelants, has on the back of it pencil figures, proven to be in the handwriting of the paying teller of the bank, as follows:

$2500
  200
———
$2700
 6364.95
———
$3664.95

This $6,364.95 was the amount of the check, and the inquiry is, what, if anything, is meant by these figures? Capt. Williams was not a witness for either party, and was proven to have been at the time on a trip to New Orleans as captain of the boat Williams, and the paying teller of the bank was not called as a witness, but Mr. Bosche was present when these two drafts on New York were presented as evidence on behalf of the mortgagee, and was not recalled to give an explanation. In this state of the testimony I am embarrassed somewhat; but, considering all of the probabilities, I have concluded that the preponderance of the whole evidence is that this $2,000 draft on New York was bought with a part of the proceeds of the $6,500 draft, and that Mr. Bosche received it from the bank in part payment of his check, and then and there indorsed it to the Grand Lake Coal Company. This seems, under the evidence, the

probabilities, and, in the absence of any explanation by the libelants, was, I think, a loan directly to the company, and rebuts any presumption which the other facts would raise that this $2,000 was intended to pay the wages of the crew and supply bills of the boat, or that Mr. Bosche either understood or expected at the time that it would be so used. This being the fact as to this $2,000, libelants have no lien on the boat, her tackle, engine, etc., for the advance of this $2,000.

It appears from the evidence of the clerk of the boat and the boat's books that a considerable part of the money advanced by libelants was actually used in the payment of wages of the crew and other claims which were liens on the boat; but it also appears that part of these advances were paid to Thomas Patterson, who was a salaried pilot on the Williams, and a part owner, and John Williams, who was the captain of the boat, and a part owner. The question arises, have the libelants a lien for these advances, which were used in the payment of claims against the boat, which were not lien claims? There may have been other claims than that of Capt. Williams paid, which were not lien claims, but the facts as to the payments to him raise the question. It appears that Capt. Williams drew $675 on February 12, 1889, and that he left Louisville on that day for Pittsburgh, where he resides, and where the Grand Lake Coal Company did business, and that on the next day, February 13th, he, with others of the Grand Lake Coal Company, who were owners of the Williams, executed a mortgage to J. D. Risher, which mortgage has been properly registered and recorded. He then returned to this city, after having executed some kind of assignment for the benefit of his creditors in Pittsburgh, and on the 15th or 16th of February, 1889, drew from the clerk of the boat all the money remaining, $3,655.82, making, presumably, $4,330.82 of the money advanced by the libelants on the 12th of February, 1889, that he received. This was on account of salary due him as captain of the boat, and was clearly not a lien claim against the boat, tackle, etc.

The able and learned counsel for the excepting mortgagee insists that before money advanced the captain of a boat in a foreign port, such as another state from that which she is registered and owned, can be a tacit lien on the boat, etc., it must be loaned on an apparent necessity, both as to the credit of the owners of the boat and the needs of the vessel itself; and also that the money thus loaned must be used for wages, repairs, and such supplies as would, of themselves, be lien claims against the boat. In other words, being money advanced, and not such as is directly attached to the vessel, or used in its navigation, it can have only such lien by subrogation as the claimants have whose debts have been paid by the money advanced. He refers to *The Wyoming*, 36 Fed. Rep. 494; *The Cumberland*, 30 Fed. Rep. 453; *The Thomas Sherlock*, 22 Fed. Rep. 255; *The Guiding Star*, 18 Fed. Rep. 264; *The J. F. Spencer*, 5 Ben. 152; *The Sarah Harris*, 7 Ben. 28; *Davis* v. *Child*, 2 Ware, 76; *Thomas* v. *Gittings*, Taney, 472; *The William Penn*, 3 Wash. C. C. 484; *The A. R. Dunlap*, 1 Low. 350; and *The Tangier*, 2 Low. 7, 15,—as tending to or sustaining his contention.

I have read with care these cases, and, while there are expressions in some of them that seem to sustain this view, I think only one of them distinctly sustains the counsel's contention. In *The Wyoming,* 36 Fed. Rep. 493, Judge THAYER says:

"It is well settled that money advanced to pay maritime claims that are **a** lien by virtue of the maritime law or a local statute may itself become a lien against the vessel whose debts have thus been discharged. But, in order to establish a lien for money advanced, it must be clearly shown that it was advanced on the credit of the vessel to pay lien claims, and that it was so used."

This case sustains the contention of the counsel. In the case of *The Cumberland,* 30 Fed. Rep. 453, the money advanced was actually used to pay lien claims, and the court say that the money thus advanced "is to be placed on the same footing as the lien to pay which it was borrowed and used;" but the question now under discussion was not in the case, nor was it discussed or considered. *The Sherlock Case,* 22 Fed. Rep. 255, does not sustain *The Wyoming Case,* and is only important in considering the present question from the fact that Judge SAGE says that in *The Guiding Star,* 9 Fed. Rep. 521, the evidence showed that the parties making the advances which were rejected as lien claims knew that their advances were being applied to the payment of miscellaneous claims. In view of the fact that Judge SAGE was at the bar in Cincinnati, where *The Guiding Star* was decided, and is the successor of Judge SWING, who decided *The Guiding Star* in the district court, this is important in construing the decision in that case as reported in 9 and 18 Fed. Rep. In *The Guiding Star,* 9 Fed. Rep. 523, the district judge, (SWING,) an able and accurate lawyer, states the doctrine thus:

"It is well established that where money is advanced to meet such claims as in themselves have liens according to the rules of admiralty, a lien also exists for such money. But, before a lien exists for money advanced, it must be clearly shown that the purposes for which it is advanced are entitled to a lien. If advanced for the *purpose* of paying seaman's wages, necessary supplies and repairs, or anything else to which a lien in admiralty attaches in that case, a lien attaches to *such* money, but not otherwise."

In that case there were claims presented for money advanced for the "general purposes of the boat," and, there being no evidence to show that it, or a part of it, was borrowed and used for the payment of lien claims, a lien was refused for these advances. But the court says:

"In the case of Menge's loan, however, * * * I am inclined to think that the advance of $1,000 was made for the express purpose of paying the running expenses of the boat, strictly so called, and therefore decide that a lien *attaches to that loan.*"

The italics are mine in these quotations, and are intended to emphasize the fact that the court says the purpose for which the advances were made gave the lien, and that the lien attached to the loan. His ruling as to admitting and rejecting liens for money advanced was affirmed by Justice MATTHEWS in 18 Fed. Rep. 265.

I need not review the other cases cited by the counsel, as we do not think they sustain, or tend to sustain, his view, unless it be the cases in 1 and 2 Low.

In the case of *The A. R. Dunlap*, 1 Low. 350, the court was discussing the meaning of the then recent case of *Pratt* v. *Reed*, 19 How. 359, and dissented from the doctrine that a material-man must bring himself within the rule applied to a lender on bottomry; that is, the material-man was bound to show not only that the supplies were necessary for the ship, or appeared to be so, but that the master had not, or appeared not to have, funds of the owner in hand to pay for them, and also that the owners had no personal credit on which they could be procured at the place where they were furnished. The learned Judge LOWELL, after indicating an opinion that the question of the credit of the owners of the vessel should not be material as to material-men who furnished supplies, or made repairs, in a foreign port, says:

"The general rule in this country is that the person who advances money to pay the debts which are liens on the ship has himself a lien for his reimbursement, (*Thomas* v. *Osborn*, 19 How. 22; *The Gustavia*, Blatchf. & H. 189;) and this is now the law of England, with some refinements and distinctions not necessary to be here examined. Perhaps the rule has grown out of the doctrine of subrogation; but, whether so or not, the lender of money has not usually any more ample remedy than the material-men themselves would have had. See *Davis* v. *Child*, Daveis, 71."

This case of *Davis* v. *Child* is reported in 2 Ware, 78, and the question there was whether or not one who furnishes money to be expended in repairing a vessel, or in furnishing her with provisions, or fitting her for sea, has the same privileges against the vessel which is allowed the material man, or the mechanics who perform the labor. The court (Judge WARE) says:

"The authorities are entirely conclusive. The lender is considered as trusting to the ship as well as the owners, and by the loan itself he acquires a privileged hypothecation, which is as sacred in every respect as that which is created by an instrument of bottomry, except that he in not entitled to maritime interest."

There certainly is nothing in this quotation, or in other language used in this opinion, which intimates that, unless the money loaned is actually used in paying the lien claims, no lien exists or is created; on the contrary, the court distinctly says that by the loan itself he acquired a privilege of hypothecation as sacred in every respect as that created by a bottomry bond, except as to maritime interest. The rights of a lender on a bottomry bond are very ably and clearly determined by Judge STORY in *The Fortitude*, 3 Sum. 229. *The Tangier*, 2 Low. 7, was a contest between the lenders of money to a captain who, the owners insisted, had been discharged by them as master before the loan was made to him. The court (Judge LOWELL) discusses the question whether there should be any difference between the rights of a lender of money to buy supplies or make repairs, and of one who loans money to pay for the supplies or repairs after they are furnished or made. He concludes there should be no difference in their rights. He then says the libelants claim a lien upon another and distinct ground, that of subrogation. He discusses at some length the doctrine of subrogation, as it appeared that the

money which was loaned the master of the vessel was used by him in paying off the crew. The opinion closes thus:

"It is impossible upon the evidence to say that the master was actually deprived of command so early as the answer represents it; but if he were, and the owners intrusted him with the duty of entering the vessel and paying off the crew, it will hardly do to say that he was not their agent for those purposes as fully as if they had never removed him at all. If his agency had ceased, the equitable doctrine of subrogation might be invoked. Either way the libelants must succeed."

It is thus seen that the equitable doctrine of subrogation is not invoked to sustain the libelant's lien for the money which he had advanced to the master of the vessel as master, but only to sustain the lien in the event he had ceased to be the master of the vessel when the loan was made to him by the libelants.

These two cases of Judge LOWELL are the only American cases which seem to intimate that the right of subrogation is the basis of a maritime lien of a lender of money either to buy or pay for supplies or materials necessary for the navigation of a vessel. We have seen that when that distinguished jurist has applied the equitable doctrine of subrogation it has not been as the basis of the general powers of the master of a vessel as the agent of the owners, but to sustain a lien for money advanced to a vessel and paid to the crew, in the event the agency of the master, as master, had at the time ceased.

The counsel suggests that there is no reported case in which a maritime lien on a vessel for money advanced to purchase necessary supplies, or to pay for them after they were purchased, has been sustained, unless the money was actually used for the purpose for which it was borrowed. I do not remember such a case; but it is equally true that no case can be cited except *The Wyoming* in which there has been a claim for a maritime lien for money advanced to the captain of a vessel to purchase necessary supplies, etc., or pay for those already purchased, and the lien defeated because, and only because, the money had not been actually used by the captain or other officers of the vessel to buy or pay for the necessary supplies, etc., for which it was borrowed by him and loaned by the claimant of a lien. The absence of such cases only proves the rarity of the misconduct of captains of vessels in the distribution of money thus borrowed. The fact that, when the circumstances are such as to authorize a captain of a vessel to create a tacit hypothecation of his vessel for advances of money, he also becomes bound personally to the lender for the advances prevents any misuse of the money should he be inclined to do so. The right of the master of a vessel to tacitly hypothecate his vessel for money advanced, under certain circumstances and surroundings, has been expressly recognized. *Thomas* v. *Osborn*, 19 How. 28; *Davis* v. *Child*, 2 Ware, 78; *The William & Emmeline*, Blatchf. & H. 66. If, however, a lender of money to the master of a vessel in a foreign port is only to have such maritime liens as his money in the hands of the captain buys, either by the purchase of necessary supplies, etc., for the vessel, or the payment of supply and other bills which already have a maritime lien, then the circumstances under which

the money is loaned to the captain is of no moment, and his authority to hypothecate the vessel for money advanced the vessel, except on a bottomry bond, is practically denied.

If subrogation to the maritime liens of others is the only privilege which the lender of money to a vessel in a foreign port has, it cannot be said that he gets a maritime lien for the money at all. The money loaned does not create the lien upon this theory, but only gives the captain of the vessel, who is the agent of the owners of the vessel, the money with which to buy lien claims against the vessel for the benefit of the lender of the money.

This theory is, we think, directly in opposition to the language of the supreme court in *Thomas* v. *Osborn*, 19 How, 28, in which the court, by Justice CURTIS, say:

"We understand it to be definitely settled * * * that by the law of England the master of a ship has not power to create a lien on the vessel as security for the payment for repairs and supplies obtained in a foreign port save by a bottomry bond; that he can only pledge his own credit and that of his owners, but cannot, by any act of his, give to the creditor security on the vessel, while at the same time the personal liability of the owners continues. * * * These decisions rest merely upon the want of authority in the master, according to the law of England, to create by his own act an absolute hypothecation of the vessel as security for a loan. But the maritime law of the United States is settled otherwise in harmony with the ancient and general maritime law of the commercial world. The master of a vessel of the United States, being in a foreign port, has power, in a case of necessity, to hypothecate the vessel, and also to bind himself and owners personally for repairs and supplies; and he does so without any express hypothecation, when, in case of necessity, he obtains them on the credit of the vessel without a bottomry bond. * * * It is not material whether the hypothecation is made directly to the furnishers of repairs and supplies, or to one who lends money on the credit of the vessel, in a case of necessity, to pay such furnishers."

The court distinctly recognizes the right of the captain of a vessel to hypothecate his vessel in that case either to furnishers of supplies and repairers or to one who lends money to pay such furnishers, and there is no intimation that the lender of money only gets a hypothecation of the vessel if the money thus borrowed is used to pay for supplies and repairs, and then to the extent only of the lien which the furnishers and repairers would have had if their debts had not been paid.

This theory of subrogation must lead to the denial of the captain's right to create tacit maritime liens on his vessel for money advanced to him under any circumstances, or to declare that the money, when advanced to a captain, only creates a maritime lien where and to the extent it is actually used by the captain for necessary repairs and supplies of the vessel. In this latter proposition, the captain, who is selected by the owners of the vessel as their agent, becomes the agent of the lender of the money to buy for him maritime liens as against his vessel and the owners, whose agent he is, and whose interest he was selected to represent. This, we think, cannot be; and it must be maintained either that a captain has no authority under any circumstances to hypothecate his vessel for money borrowed, except on a bottomry bond, or that, if the facts and circumstances surrounding a captain and his vessel authorize

the borrowing of money on the credit of his vessel, what he afterwards does with the money is not material to the creation of a maritime lien. Subrogation is not the basis of the maritime liens given a lender of money to the captain of a vessel, and such a doctrine is not sustained either by reason or authority.

The libelants, M. Nippert & Co., have a maritime lien on the tow-boat Williams, her tackle, etc., for their entire advances, except the $2,000 sent to the Grand Lake Coal Company, and may have an order withdrawing from the registry the amount of their said advances, with interests and costs.