## NIPPERT *et al. v.* THE J. B. WILLIAMS.

*(Circuit Court, D. Kentucky. April 5, 1890.)*

1. MARITIME LIEN—ADVANCES—ACCOMMODATION INDORSERS.

Where a draft, drawn in a foreign port by the master of a steamer upon the owners, to the order of a firm accustomed to furnish the steamer with supplies, is indorsed by the firm, and discounted with a bank, and the proceeds immediately turned over to the master, the firm is an accommodation indorser only; and although it has taken up the draft, which bears upon its face the words, "Charge to wages and supply account," it cannot assert a lien against the steamer for the amount thereof.

2. SAME—DUTY OF INQUIRY.

It is incumbent upon one who makes advances to the master of a steamer in a foreign port to ascertain for what purposes the money is needed; and although advances are made upon drafts against the owners which bear upon their faces the words, "Charge to wages and supply account," there is no lien except for the amounts actually used in discharging claims which constitute a lien against her.

Reversing 39 Fed. Rep. 823.

In Admiralty. Libel for advances. On appeal from district court, 39 Fed. Rep. 823.

*Goodloe & Barr,* for libelants.

*Knox & Reed* and *Brown, Humphrey & Davie,* for intervenor.

JACKSON, J. The question presented by the appeal and cross-appeal in this case relates to the proper distribution or disposition to be made of the surplus proceeds in the registry of the court arising from the sale of the steamer or tow-boat J. B. Williams. The contest over the fund is between the intervening claimant, I. D. Risher, as mortgagee of the boat, and M. Nippert & Co., who on February 16, 1889, libeled the J. B. Williams for alleged advances made to her master in December, 1888,

and February, 1889, to enable him to pay off the crew and hands of the vessel, and supply bills furnished her by others. The steamer was sold during the progress of the proceedings, and the proceeds thereof were deposited in the registry of the court. Intervening libelants, asserting maritime liens against the boat, and as to whose claims there was no dispute, have all been paid out of said proceeds of sale, and there remains in the registry a considerable surplus, as to which libelants, Nippert & Co., claim priority of lien for their alleged advances to the steamer, or to the master thereof on the credit of the boat; while Risher, as mortgagee of the steamer, controverts the validity of said libelants' lien, and claims said fund as properly belonging to himself. The district court rejected a portion of libelants' claim and allowed the balance. From this decree both sides have appealed. The material facts of the case on which the questions of law arise, and the rights of the respective claimants depend, are the following, viz.:

The steamer J. B. Williams was owned by the Grand Lake Coal Company, a private firm or copartnership, composed of Joseph B. Williams, James Williams, John Williams, and Thomas Patterson, residents of Pittsburgh, Pa., which was the firm's place of business, and the home port of said steamer, and where she was registered or enrolled. John Williams, one of the partners, was the captain and master of the vessel, and Thomas Patterson, another partner, was one of his pilots. The Grand Lake Coal Company was engaged in the coal trade between Pittsburgh and points south on the Ohio and Mississippi rivers, by means of barges which were transported by its tow-boats, of which the steamer J. B. Williams was the largest. The J. B. Williams, being the largest tow-boat on the river, at the opening of navigation in the fall would come down from Pittsburgh to Louisville, Ky., with a tow of barges loaded with coal. After carrying its tow to destination, the steamer would return to Louisville, and lie up there, or at the landing on the Indiana side of the river, and await the coming down of another tow of coal-barges from Pittsburgh, which upon arrival it would take charge of and transport south to destination, generally New Orleans, and then return to Louisville, where its crew would be paid off, and the boat would be tied up until other barges arrived to be carried south. So that, after coming down from Pittsburgh in the fall, said steamer rarely, if ever, returned to that port during the season of navigation, but made Louisville, or the Indiana port opposite, her starting and returning port during the period. Upon her return from trips south, her crew and hands would be paid off. Her services being chiefly rendered for her owners, she earned but little money with which to meet her expenses, which were considerable for each trip south and back.

The libelants, M. Nippert & Co., were and are ship-chandlers and dealers in boat stores at Louisville, and were in the habit of furnishing said steamer with supplies upon the order or request of her master. Their bills for such supplies were generally paid at the company's office in Pittsburgh. Libelants knew that John Williams, the master of the steamer, and Thomas Patterson, the pilot, were each members of said

firm styled the "Grand Lake Coal Company." In addition to furnishing said steamer with boat-store supplies, libelants were in the habit, after each return trip of the steamer, of indorsing a draft of the master drawn at Louisville upon the Grand Lake Coal Company, at Pittsburgh, for such amount as the master might indicate or desire to meet the accrued expenses of the vessel. Such draft or drafts were made payable to the order of M. Nippert & Co., and contained upon their face the statement or direction to "charge to wages and supply account of str. J. B. Williams." After indorsement by said M. Nippert & Co., the drafts, usually drawn payable 90 days after date, would be discounted by the Masonic Savings Bank at Louisville, and the proceeds thereof be paid over to the master, and be by him or the clerk of the steamer expended or disbursed. This manner of raising funds for the steamer continued for 13 or 14 years. No question was ever made by the drawees of the master's authority thus to draw upon them, and his drafts, indorsed by Nippert & Co., and discounted by the Masonic Savings Bank of Louisville, were in every instance honored by acceptance upon presentation; and at maturity were taken up by the drawees, the owners of the steamer, except the drafts involved in the present controversy. The Masonic Savings Bank, which cashed or discounted such drafts of the master, required an indorser thereon, and such indorsement was made generally, if not in every instance, by libelants.

The steamer having returned from a towing trip to New Orleans, and the master, John Williams, needing funds for the boat, and $2,000 for the Grand Lake Coal Company, went to libelants on December 11, 1888, to raise and procure, in the usual way, the sum of $6,500 for said purpose. He drew his draft as captain for that amount, payable 90 days after date, to the order of libelants, on the Grand Lake Coal Company, at Pittsburgh, Pa., the draft expressing on its face that it was for "value received, and charge to wages and supply account of steamer J. B. Williams." This draft was indorsed in blank by M. Nippert & Co., and Christian Bosche, the financial member of said firm, went with the master to the Masonic Savings Bank of Louisville to have it discounted. It was discounted by said bank, the discount and exchange charged and deducted from the face of the draft being $135, leaving, as the net proceeds of the draft, the sum of $6,364.95, which was placed to the credit of the indorsers on the books of the bank, and for which M. Nippert & Co. at the same time drew their check, which was payable "to proceeds of draft or bearer." On this check of $6,364.95, for the proceeds of the draft, the bank paid over to the master of the steamer the sum of $3,864.95, and for the balance issued its two drafts on the Importers' & Traders' National Bank of New York, payable to the order of M. Nippert & Co.,—one for the sum of $500, which said Nippert & Co. specially indorsed to the order of James Rafferty, a pilot on the J. B. Williams, to whom that amount was due from the steamer; the other for the sum of $2,000, which said M. Nippert & Co. indorsed to the order of the Grand Lake Coal Company, and which was forwarded to said company, and used by it. This application of the $2,000 bank draft will

be further noticed and explained later on.    The proceeds of his $6,500 draft, received by the master, amounting to $3,864.95, appears to have been used by him or the clerk of the steamer in paying off the boat's crew, to whom about $2,972.30 was then due, and for supplies.    Said draft for $6,500, so discounted by the bank, was accepted by the drawees on December 19, 1888.    Early in January, 1889, the J. B. Williams made another trip to New Orleans, and returned about February 11, 1889, tying up on the Indiana side of the Ohio river, opposite Louisville, and on the 12th February, 1889, the master again went to libelants for the purpose of raising the sum of $7,800 to meet the wants of the steamer.    Christian Bosche, libelants' financial manager, explains in his deposition what then occurred between the captain and himself.    He says:

"The captain came in in the morning, and he had a little memorandum on which was $7,600 or $7,800, I cannot tell exactly which, that he said that he needed for the boat.    I asked him if that was not a large amount.    He told me that he had drawn no money in New Orleans; that he owed bills at Memphis for supplies, and at different points; also Howard Ainslie & Cochran & Co.; and his yearly officers were pretty well behind, and it would take all that to pay it out.    He says: ' Do you want any money? '    I says: ' I would like to have the money to pay my November bill of stores that I supplied in November, and a few little bills paid here for you.'    My bill was $972.80, which, with costs paid out for the boat, made $1,022.30.    That, added to the $7,600 or $7,800, (I am not positive what the amount was,) made about $8,800.    He says: ' You had better make a draft for $9,000;' which I did, and we went and had it discounted, and here is the check for the proceeds which I gave to the bank,—$8,824.25.    The draft is for $9,000, and that is less the discount. The discount on that $9,000 draft and exchange on Pittsburgh was $175.25."

Said draft was in the same form as the December draft for $6,500.  It was drawn by John Williams, captain, payable 90 days after date, to the order of M. Nippert & Co., with the direction on its face to "charge to wages and supply account of steamer J. B. Williams," and addressed to the Grand Lake Coal Company, at Pittsburgh, Pa., as the drawees. The proceeds of this draft were placed to the credit of M. Nippert & Co., the indorsers, and at the time of the discount they drew their check, "Pay to proceeds of str. J. B. Williams, draft, or bearer," for the amount of said proceeds, $8,824.25, which was applied as follows:    $1,022.30 in paying their own bill, for which they were given a deposit ticket by the bank, and the balance of $7,801.95 was paid over by the bank to John Williams, the master of said steamer, and was by him appropriated and expended as follows:    $2,556.69 was used in paying off the crew; $1,159.15 was paid to Thomas Patterson, one of the partners and joint owners of the steamer, for services as pilot, and the balance was appropriated by Capt. John Williams, also a partner and joint owner of the the boat, towards the payment of his salary as master.    When Capt. Williams applied to libelants on February 12, 1889, to assist him in raising the money he wanted for the steamer, the clerk of the boat, Ike Williams, accompanied him, and had on the back of an envelope a memoranda of the items making up the sum wanted.    This memoranda,

which the proof satisfied the court was shown to and seen by said Christian Bosche, was as follows: "Crew, $3,000; Capt. Thomas Patterson, $1,000; Capt. Jno. Williams, $2,000; bills amt. to $1,300; sundries, $500." Said Bosche knew that said Patterson and Capt. Williams were members of the firm that owned the steamer; that Capt. Williams was one of the yearly officers, and was informed, not only by Capt. Williams, but by said memoranda, that a portion of the money wanted was for the benefit of said yearly officers. But, aside from said memoranda, Capt. Williams and Christian Bosche, the managing member of libelants' firm, who conducted said transactions, both state that the latter made no inquiry as to the items for which money was wanted by the master, when applied for and raised as above stated; that libelants merely took the captain's word for what he wanted, or for the amount he needed for the boat, and raised it in the above-described manner, without asking any questions or making any inquiry, or without being furnished any statement as to the particular items or objects for which the money was wanted or needed. The funds were, however, understood by libelants to be for the purposes of the steamer, such as the payment of her crew, stores, supplies, and running expenses.

When said drafts for $6,500 and $9,000 were drawn and discounted, neither the master nor the steamer, or her owners had any funds on hand at Louisville, or on the Indiana side of the river, where the steamer was lying, with which to pay the crew and supply bills. There was at said respective dates no imperative or pressing necessity for money except to pay off the steamer's crew, which was generally discharged after each return trip of the boat. The steamer and her owners were not without credit at Louisville. It is shown that the master could have raised money for the wants of the steamer on similar paper at Louisville through other sources than libelants. The master made no express hypothecation of the steamer to secure said drafts, or the proceeds thereof, or to protect libelants as indorsers thereof. Libelants supposed that said drafts containing the words, "Charge to wages and supply account of str. J. B. Williams," gave them a preferred lien on the steamer. They state that the money was raised and supplied on the credit of the boat as usual, and that said recital on the face of the drafts was intended to record the fact. The proof, however, discloses no understanding or agreement between libelants and the master or owners that said drafts, or the proceeds thereof, were to constitute any lien upon the steamer; nor does it appear that libelants ever communicated, either to the master or owners, this supposition that the words, "Charge to wages and supply account of str. J. B. Williams," on the face of the drafts, created a lien upon the steamer. Neither as to said drafts of December 11, 1888, and February 12, 1888, nor as to any former draft of like character and purpose, does it appear that libelants kept or made any account or charge, against said steamer or her master or owners, for either the face of said drafts or the proceeds thereof. On the other hand, the books of the steamer, containing the contemporaneous entries of the transactions, show that the amounts of said drafts of December 11, 1888, and Febru-

ary 12, 1889, like all previous ones drawn for the purpose of raising funds for the boat, were debited to cash, while the discount charged for cashing said drafts, together with all other sums paid out of the proceeds received therefrom, are credited to cash. On February 13, 1889, the Grand Lake Coal Company, or the partners comprising said firm, conveyed said steam tow-boat J. B. Williams to the intervening claimant, I. D. Risher, by way of mortgage, to secure to him the payment of $20,-000, due him from said company. Said mortgage was duly filed for record on February 14, 1889, and recorded in the collector's office for the port of Pittsburgh, as required by law in such cases. The firm shortly thereafter made a general assignment for the benefit of its creditors. Upon learning of the company's failure, libelants requested the Masonic Savings Bank, as the holder and owner of said drafts of December 11, 1888, and February 12, 1889, to recall the former, which had been accepted, and not to forward the latter for $9,000, which had not been presented for acceptance, which the bank did. On February, 16, 1889, libelants filed their libel against said steamer J. B. Williams, alleging, in the third and fourth articles thereof, that on December 11, 1888, and February 12, 1889, they had furnished and advanced to said steamer the respective sums of $6,500 and $9,000, at the request of the master, and upon his representation that said amounts were at said dates needed for the purpose of paying wages of the boat's crew and hands, supplies, and that said advances were made on the credit of said steamer as well as of the owners. Five or six days after the steamer was libeled, libelants gave their paper or note to the Masonic Savings Bank for the $9,000 draft, and the master then and that time gave them a receipt for $9,000, the amount represented by the draft, and the note they gave the bank to take up the draft. This note they have not yet paid in full. Under an order entered in August, 1889, libelants withdrew $7,500 of the funds in court, which they used in paying off the draft of December 11, 1888, for $6,500, and in making a partial payment on the $9,000 indebtedness to the bank. Under the same order, the intervening claimant, I. D. Risher, withdrew $3,500 of said funds. Said order does not appear in the record, nor does it appear whether said parties are liable to return or refund said amounts. There still remains in the registry of the court, of said proceeds of the steamer, $8,548.22. At the hearing in the district court, libelants produced said two drafts for $6,500 and $9,000, and offered to surrender the same.

By the decree of the district court libelants were allowed the full amount of the draft for $9,000, with interest since February 12, 1889, and $4,500 of the draft for $6,500, with interest since December 11, 1888, which sums were declared a maritime lien on said steamer, and entitled to priority of payment out of the proceeds thereof remaining in the registry of the court. The $2,000 sent, as above stated, to the Grand Lake Coal Company, December 11, 1888, out of the proceeds of the draft for $6,500, was not allowed to libelants. From so much of said decree as disallowed said sum of $2,000 libelants have appealed, and from so much of said decree as allows libelants said sum of $9,000

and $4,500 the intervening claimant and mortgagee, I. D. Risher, has appealed. Since said appeals were perfected, libelants have filed in this court, without leave of the court, so far as the record discloses, an amended libel, alleging that said sum of $2,000, which was forwarded to the Grand Lake Coal Company, out of the proceeds of the draft of December 11, 1888, for $6,500, was applied in part payment of a previous draft of like character, which matured about that time, and under the following circumstances: On April 7, 1888, the captain of the J. B. Williams drew a draft on the Grand Lake Coal Company, at Pittsburgh, for the sum of $5,500, payable 90 days after date, to the order of libelants, containing on its face the usual words, "Charge to wages and supply account of str. J. B. Williams," which was indorsed by libelants, and discounted by said Masonic Savings Bank; the master of the steamer, as alleged, receiving the proceeds. That at the maturity of said draft, which the drawees accepted, it was renewed on July 9, 1888, for the sum of $4,000, for which a draft was drawn upon the company, by Joseph B. Williams individually, payable at 90 days, to the order of the Masonic Savings Bank, containing the words, "Charge to wages account of str. Jos. B. Williams." This draft was indorsed in blank by M. Nippert & Co. It was not taken up at maturity, but was paid in part and renewed for $3,000, by draft for that amount, dated October 9, 1888, drawn by John Williams, captain, on said coal company, payable 60 days after date to the order of M. Nippert & Co., saying on its face, "Charge to wages and supply account of steamer Jos. B. Williams." This draft was indorsed by M. Nippert & Co. It was duly accepted; and as it matured on the 12th December, 1888, said sum of $2,000, out of the proceeds of the draft of December 11, 1888, for $6,-500, was forwarded to the coal company to take it up, and said amount was so applied. It is accordingly claimed for libelants that said sum of $2,000, disallowed them by the decree below, went to pay off a prior subsisting maritime lien on the steamer arising out of the $5,500 draft of April 7, 1888, and kept alive by said renewals. There is no evidence, aside from the paper itself, as to what the $5,500 draft of April 7, 1888, was given for, nor what amount of the proceeds thereof, if any, were received by the master for the use of the steamer, or how expended, if received; nor upon what consideration said draft, and the renewals thereof, were indorsed by libelants. The renewal draft of July 9, 1888, for $4,000, was not drawn by the master, but by Joseph B. Williams, and was made payable to the order of the Masonic Savings Bank, and was indorsed by libelants.

On the foregoing facts, the court finds or reaches the following conclusions of law:

1. That the claims of libelants to be allowed said sum of $2,000, sent on December 11, 1888, direct to the Grand Lake Coal Company, out of the proceeds of the draft of $6,500, drawn and discounted on that day, cannot be sustained, and was properly rejected by the district court.

2. That neither the drafts of December 11, 1888, and February 12, 1889, for the respective sums of $6,500 and $9,000, nor the proceeds

thereof received by the master of said steamer J. B. Williams, constituted any maritime lien on said steamer or its proceeds in favor of libelants.

There was no express agreement or understanding that either libelants, or the bank discounting such drafts, should have any lien, maritime or otherwise, on the steamer to secure the payment of the drafts. The words contained on the face of the drafts, "Charge to wages and supply account of str. J. B. Williams," had no other operation and effect than merely to notify and advise the drawees of the objects for which the drafts were drawn, and the account to which upon payment it should be charged. These words did not, nor did the drafts themselves, create a lien on the vessel.

In *The Woodland,* 104 U. S. 180, the master's drafts on the owners expressed on their face that they were recoverable against the vessel, freight, and cargo. The drafts were not paid, and the holders thereof libeled the boat. The supreme court held that—

"The drafts did not themselves create a lien on the vessel; unless the debt for which they were given bound the vessel, the drafts, notwithstanding what is expressed on their face, did not. If the owners owed Niles [the payee of the drafts] nothing under his contract with the master for the repairs and supplies which had been furnished, he had no lien on the vessel which he or any one else could enforce in admiralty. For the purposes of this suit, the libelants occupy no better position than Niles; and if he could not recover they cannot. Having advanced their money in good faith, they may not be affected, so far as their remedies against the parties to the drafts are concerned; * * * but if the vessel owed Niles nothing, it does not owe them."

Libelants had no claim against the owners, or lien upon the steamer, for the amounts represented by said drafts at the time they were drawn and discounted. They had made no loan or advances of their own funds or money to the master for the use of the steamer, which the drafts were intended to repay. They indorsed the master's drafts to enable him to obtain from the Masonic Savings Bank the proceeds thereof. The bank derived title to the drafts through their indorsement, which was manifestly made for accommodation of the drawer and owners of the steamer, and paid over the proceeds thereof, less discount and exchange, to the master. The bank furnished the money upon the drafts, and the contingent liability of libelants as indorsers thereof. Libelants had no right of ownership to the proceeds of the drafts by virtue of their indorsement. They did not own the drafts before they were discounted. They had advanced or paid no consideration for the drafts, and were not the holders thereof for value when transferred to the bank, nor did they assume the primary liability of taking them up at their maturity. On the contrary, the drafts were drawn to be discounted for the benefit of the steamer in the usual way, and as between the steamer and her owners and the libelants, the latter occupied the position of accommodation indorsers. If the bank, while holding the drafts, had attempted to enforce against the steamer a maritime lien for their payment, its claim could not have been sustained, either as to the drafts or the proceeds

thereof received by the master, under the authority of *The Woodland*, because the words expressed on the face of the paper, "Charge to wages and supply account of str. J. B. Williams," did not operate to create a lien upon the steamer; because the bank did not discount the drafts upon the credit of the steamer, or upon the faith that the boat was hypothecated for their payment, and because the libelants, through whose indorsement it acquired title to the drafts, had no such lien upon the steamer at the time they were indorsed and received by the bank.

When the libelants took up the drafts, after libeling the steamer, they certainly did not thereby acquire any new maritime lien on the steamer superior to that held by themselves, before they were discounted or by the bank as the first holder thereof for value. It being settled that libelants advanced no consideration for, and acquired no beneficial right in and to, the drafts when drawn, and that said drafts did not operate either as an express or implied hypothecation of the steamer, notwithstanding the direction on their face to charge the amounts thereof to wages and supply account of the steamer, they can only be regarded as commercial paper, executed for the purpose of discount for the benefit of the owners of the steamer, and libelants, in taking up the same, under their liability as indorsers either before or after maturity, can occupy no better position in respect to liens on the steamer than the bank, the first holder for value, from whom they acquired the paper, which acquisition conferred upon them their first and only right to enforce payment, even against the owners of the steamer. If libelants had advanced their own money to the master as and for the purposes alleged in their libel, and indicated on the face of the draft, and had accepted the drafts as a mode of repayment or as conditional payment therefor, the question would have been different. But that was not the real transaction. Libelants only loaned the credit of their names by indorsing drafts, in and to which they had no right, title, or interest; and, on the loan of this credit, the drafts are discounted, and the proceeds received by the master and owners. In the careful examination of the authorities which the court has made in the investigation of this case, no decision has been found which will warrant the court in placing a loan of credit in the shape of an accommodation indorsement upon commercial paper upon the same footing as an actual advance of funds to a master to enable him to discharge maritime liens. In the absence of any controlling authority on the point, our conclusion is that libelants' indorsement of the drafts for accommodation, and their subsequent taking up of the same, do not sustain the allegations of their libel that they made advances to the master of the steamer on December 11, 1888, and February 12, 1889, which gave them a maritime lien upon the boat for any portion of said drafts. It is proper to state that the foregoing considerations, which lead the court to this conclusion, do not appear to have been called to the attention of, or been considered by, the learned district judge, who declared a maritime lien in libelants' favor for the amount of said drafts, less the $2,000, remitted to the drawers out of the proceeds of the draft of December 11, 1888, for $6,500, as above explained. In reaching a conclusion adverse

to the right of libelants to any maritime lien upon said steamer or its proceeds, either on said drafts, or for the proceeds thereof received by the master and owners of the steamer, it is a source of gratification that the amount involved is sufficient to enable libelants to have that conclusion reviewed by a higher tribunal.

3. That if libelants could be considered as having made advances to the master for the purpose of paying the steamer's crew, and for supplies furnished her, constituting maritime liens, their right of recovery, under the facts and circumstances of this case, would be limited to the amounts actually used by the master in discharging such liens. If they did not see the memoranda made by the boat's clerk, showing the items for which the money was wanted on February 12, 1889, three of which—sundries, $500; for Capt. Williams, $2,000; and for Capt. Patterson, $1,000 —were not lien claims, they made no inquiry as to the items or particular objects for which the master desired funds. A party lending to a master in a foreign port cannot shut his eyes to existing facts as they appear, or by reasonable inquiry could be made to appear, and deal with the master as a general agent of the vessel and owners, whose representatives he may trust and act upon without any diligence or inquiry on his part as to the extent of, and character of, the vessel's needs and necessities. Necessity creates the agency and confers the authority on the master to borrow or secure loans on the credit of the vessel, and that necessity equally defines the limits to which he may rightfully go, and the lender treating with him must make inquiry and judge for himself; and at his own risk, whether the desired advance is a matter of such necessity as to bring it within the master's agency and authority. The cases on this subject, which it is not deemed necessary to review, do not, in my opinion, establish the proposition contended for by counsel for libelants, and announced in the opinion of the district judge, that a lender in a foreign port can act alone upon the master's representation as to the purpose for which the loan is wanted, and, if such expressed purpose is maritime in its character, thereby acquire a maritime lien on the vessel for the full amount of the advances made. When funds are advanced to the master to discharge valid existing maritime liens, and are so used, the lender may properly and equitably stand in the place of the lienholders, whose demands have been discharged with funds furnished by him. It seems to me that the weight of reason and authority supports this position, especially in the case of a lender who makes no inquiry, but shuts his eyes as to the necessary wants of the vessel. I think it the safer and the sounder doctrine to follow the intimation, if not the point actually decided, in the cases of The A. R. Dunlap, 1 Low. 350; The Tangier, 2 Low. 7–15; The Guiding Star, 9 Fed. Rep. 521, 18 Fed. Rep. 264; The Cumberland, 30 Fed. Rep. 453; The Dora, 34 Fed. Rep. 343; The Wyoming, 36 Fed. Rep. 494; The Augustine Kobbe, 37 Fed. Rep. 701,—that where funds are advanced to the master on the credit of the vessel, otherwise than upon bottomry bond, to enable him to pay off maritime liens, and the funds are so used or applied, the lender acquires a lien of equal rank and standing to those discharged with the funds so advanced; that money

borrowed to pay a bill stands in the same relation to the vessel as the bill paid. If that was a lien, so is the new debt created by the loan, but not otherwise.

But, without dwelling on this question, which is controlled by the second conclusion of law finding that libelants acquired no maritime lien on said steamer J. B. Williams by reason of said draft transactions, it follows that the intervening claimant, I. D. Risher, as mortgagee, has the better right to the proceeds of said steamer, to the extent of his mortgage lien thereon. It is accordingly ordered and adjudged that the decree of the district court declaring a lien upon and directing payment out of the proceeds of said steamer in libelants' favor, to the extent of said drafts for $9,000 and $6,500, less the $2,000, as aforesaid, be, and the same is hereby, reversed, and the libel in respect to said claims covered by the third and fourth articles thereof, together with the amended libel filed in this court is dismissed, at libelants' costs. The proceeds of the vessel, to the extent of his mortgage, are awarded to the claimant, I. D. Risher, and a decree will be entered accordingly.