## THE ALLIANCA.[1]

### HIGGINS et al. v. THE ALLIANCA.

#### (District Court, S. D. New York. May 15, 1894.)

1. MARITIME LIENS—PREMIUM OF INSURANCE—DOMESTIC VESSEL—STATE LAW —DEBT CONTRACTED ABROAD—SPECIFICATIONS—SUBROGATION.

Libelants, as brokers acting for a domestic steamship company, procured insurance on the vessels of the company in England, T. & Co., their English correspondents, obtaining the policies from underwriters there. According to the established usage in England, T. & Co. paid the premiums. and charged them against the libelants, but they filed no specifications of lien here. Libelants denied any legal liability to T. & Co., but afterwards reimbursed T. & Co., and, themselves filing specifications, brought these suits against the vessels of the company to recover the money advanced. The law of New York state gives a lien for certain debts "contracted within this state." *Held* that, T. & Co. having no lien, both because the debt was contracted in England and because they had filed no specifications, libelants could acquire none from them by subrogation.

2. SAME—ADVANCES—REPAYMENT OF DEBT NOT ACCOMPANIED BY LIEN—CREATION OF NEW LIEN.

The law of New York state gives a lien "for advances made for the purpose of procuring necessaries for a ship or for the insurance thereof." *Held* that, to create a lien, the advances must be made for the purpose of obtaining the insurance, or paying off those who have a lien therefor; and where they are made merely for the purpose of repaying an old debt, not accompanied by any lien, no lien is created in favor of the person making such advances.

This was a libel by A. Foster Higgins and others against the steamship Allianca to enforce an alleged lien under a statute of the state.

Wing, Shoudy & Putnam and R. D. Benedict, for libelants.
Carter & Ledyard, for respondents.

BROWN, District Judge. The above libel, and three others of similar purport, were filed for the purpose of enforcing alleged liens, under the law of this state, for moneys advanced by the libelants for the payment of certain premiums upon policies of insurance procured in England by the libelants, as brokers, through Tyson & Co., their English correspondents, in behalf of the United States & Brazil Mail Steamship Company, upon their steamers Seguranca, Vigilancia, Allianca, and Advance. The policies ran for one year each, and were taken out in England at various dates from March to November, 1892, by Tyson & Co., who were insurance agents at Liverpool and London. By the established usage of business in England, the underwriters there look alone to the local agent or broker who procures the insurance for the payment of the premiums. The debt for premiums is owed to the insurer by the broker alone. Tyson & Co., in pursuance of this usage, paid to the underwriters the premiums on each policy shortly after it was issued, and the policies were forwarded to the libelants.

[1] Reported by E. G. Benedict, Esq., of the New York bar.

The libelants had for several years previous been accustomed to procure the insurances upon the company's vessels, and to attend to the adjustment and collection of any losses that might happen thereunder. Before the present policies were issued, the libelants, in consequence of the steamship company's delays in reimbursing Tyson & Co. for the premiums advanced on previous policies, made an agreement with the president of the company that the present policies, when issued, should be retained by the libelants in their possession for their security. There were two ways in which the possession of the policies might serve as such security: (1) By exercising the option to cancel the policies at any time during the current year, whereby the unearned premiums, according to the provisions of the policies, would be returned by the insurers, thus limiting any further liability for the premium, and reimbursing the advances to that extent; (2) by enabling the libelants, upon the adjustment and collection of any losses happening upon any of the policies, to apply the receipts for losses to the payment of the premiums advanced by Tyson & Co. on all the policies.

The libelants had been for several years in the habit of obtaining other policies from English underwriters through Tyson & Co., in behalf of other shipowners. Tyson & Co., from time to time, sent to the libelants an account current, in which all the premiums paid and advanced by Tyson & Co., in pursuance of the English usage above stated, were charged against the libelants; and the latter were credited in the account with all moneys collected by Tyson & Co. in the transaction of the insurance business in behalf of all the libelants' customers. Mr. Gourlie, one of the libelants, who had special charge of these matters, testified that the libelants had never recognized the balances stated in these accounts as debts owing by them to Tyson & Co., nor had they ever, before the present instance, advanced moneys to Tyson & Co. to reimburse them for their payment of premiums; but that libelants had acted only as brokers, and had recognized no obligation to Tyson & Co., except to endeavor to procure payment of the premiums from the insured, and to forward the collections to Tyson & Co. as they were received.

On February 28, 1893, after repeated failures to procure from the steamship company sufficient moneys to pay for the current premiums from month to month, amounting to an average of about $5,000 per month, Mr. Gourlie arranged with Mr. Ivins, the president of the company, for an immediate cancellation of the policies on the four vessels insured, as soon as they should arrive in port; the president also telling him to resort to a lien for their security. The libelants thereupon, shortly afterwards, gave orders for the cancellation of the policies, and remitted to Tyson & Co. about $30,000, the balance owing for premiums already earned upon the current policies up to that date, and thereupon filed notices of liens therefor upon the four vessels above named, under chapter 482 of the Laws of 1862 of this state. Mr. Gourlie testified that he considered Mr. Ivins' request to cancel the policies, and to look to his lien, as equivalent to a request to repay to Tyson & Co. the balance owing

for premiums already earned, and that he could not properly direct Tyson & Co. to cancel the policies without paying such earned premiums.

The state act provides, in section 1, that "whenever a debt amounting to $50 or upwards shall be contracted by the master, owner, builder, etc., of any ship or vessel, or the agent of either of them within this state * * * (subdivision 4) on account of loading or unloading, or for advances made for the purpose of procuring necessaries for such ship or vessel, or for the insurance thereof * * *, such debt shall be a lien upon such vessel," etc. Subdivision 5 of section 1 gives a lien "whenever a debt amounting to $25 or upwards shall be contracted as aforesaid, within this state, on account of the towing or piloting such vessel, or on account of the insurance, or premiums of insurance of or on such vessel or her freight." Section 2, as amended by the Laws of 1886, c. 88, provides that "such debts shall cease to be a lien at the expiration of twelve months after the said debt was contracted, unless at the time when said twelve months shall expire such ship or vessel shall be absent from the port at which said debt was contracted; in which case, said lien shall continue until the expiration of thirty days after such ship or vessel shall next return to said port; and in all cases such debts shall cease to be a lien upon such ship or vessel unless the person having such lien shall within thirty days after said debt is contracted cause to be drawn up and filed specifications of such lien," etc. By the express language of this statute it applies only to debts "contracted within this state." The obligation of the steamship company, therefore, to Tyson & Co., in England, for the premiums of insurance paid by them, constituted no lien upon these vessels, both because no specifications were filed by them, and because the debt to Tyson & Co. for such premiums was contracted in England, where the policies were taken out, and where the payment of premiums was made. Tyson & Co., therefore, having no lien, the libelants could acquire none from them by subrogation.

The libelants claim a lien, however, under the fourth subdivision of the first section of the act, which gives a lien "for advances made for the purpose of procuring necessaries of such ship or vessel, or for the insurance thereof." This provision must be construed in harmony with the evident meaning of the context, and with the general purpose of the act. The act is drawn in language familiar to the maritime law, and its phrases must be interpreted in accordance with maritime usage. The intent of the act evidently is to supplement the maritime law of this country by providing for certain liens upon domestic ships in cases in which our maritime law does not recognize any lien, except upon statutory provision; and to allow a lien also for the building and insurance of vessels, for which a maritime lien is given by the law of most maritime countries, but not by ours. The act provides, in accordance with the policy of the maritime law, against any long continuance of secret liens, by requiring a public registration of the claim in all cases within 30 days after the debt was contracted. The presumed necessities and

conveniences of commerce are the foundation of all maritime liens, and the state act recognizes the same need for domestic ships as for foreign ones. Advances of money in order to obtain necessaries are placed by the maritime law on the same footing as the necessaries themselves; if they are made for the purpose of obtaining the necessaries, or of paying those who have a lien therefor, they enjoy the same privilege. Thomas v. Osborn, 19 How. 29; The J. B. Williams, 42 Fed. 533. Subdivision 4, above quoted, adopts the same rule, and should be subject to the same construction. It does not apply to advances which are neither made for the purpose of obtaining necessaries or insurance, nor are the means of discharging an existing lien for either, but are simply the means of repaying an old debt, not accompanied by any lien. This qualification, which is expressly established by the language of subdivision 4, as respects advances for necessaries, is, by implication from the context, ·equally applicable to advances for insurance. Both clauses are ejusdem generis. As the libelants' advances to Tyson & Co. were not made for the purpose of procuring insurance, nor of paying off any lien held by Tyson & Co., subdivision 4 does not apply. Subdivision 5 cannot apply, for that evidently refers to a debt contracted directly and immediately for premiums, whereas the debt to the libelants is in effect a debt for money borrowed to repay an old debt for premiums owed to Tyson & Co.

To sustain this claim of lien would, in effect, nullify the evident general intent of section 2, which is to prevent both the long continuance of liens and their secret character. If the payment by the libelants of Tyson & Co.'s advances for premiums made from 4 to 12 months previous can be the foundation of a new lien, where no lien existed before, then, similarly, new liens could be created for old debts for supplies at any time during 6 years after the original debts arose. This is manifestly contrary to the object and the intent of the statute. Even where the original supply men had neglected to comply with the statute by filing specifications within 30 days, and so lost their liens, a reimbursement by a third person at the debtor's request, no matter how long after, would, upon the construction contended for, create new liens for these ancient supplies. I cannot give the statute such a construction. A different question would have been presented had the libelants been originally liable to Tyson & Co. for the premiums, as guarantors or otherwise, but the evidence of Mr. Gourlie excludes that question, as he denies any original liability. The libel must, therefore, be dismissed.