## THE WILLAMETTE VALLEY.

### CHANDLER v. THE WILLAMETTE VALLEY.

(District Court, N. D. California. June 4, 1896.)

1. **Maritime Liens—Sale under—Surplus—Judgments of State Courts—Execution—Lien of.**
   The holder of a judgment rendered in a state court, who has issued process of execution against a vessel which has been seized under maritime liens, has no lien for the satisfaction of his judgment upon the surplus arising from a sale of the vessel to pay such maritime liens. The Lottawanna, 20 Wall. 201, and The Balize, 52 Fed. 414, followed. The Daniel Kaine, 35 Fed. 785, 787, disapproved.

2. **Same—Master—Pilot's Lien—Waiver.**
   Where a licensed pilot acts as master of a steamer, he waives his lien for services as pilot, even though such services were rendered and he received an excess of wages on account of his qualifications as a pilot. The Balize, 52 Fed. 414, followed.

3. **Same—Libeled Vessel—Sureties for Release—Lien of.**
   The sureties on a bond given for the release of a vessel belonging to a corporation in the hands of a receiver were compelled to pay the amount of the decree against the vessel. Their claim for the judgment and costs, but not for counsel fees, etc., was allowed, and made a preferred claim even over the receiver's certificates. Subsequently the vessel was sold to satisfy certain maritime liens, and the sureties brought a claim against the surplus arising from such sale for the total amount paid out by them. Held, that they had no lien upon such surplus, but only a personal claim against the owner, which could not be allowed when there were other claims pending against the fund. Carroll v. The Leathers, Fed. Cas. No. 2,455, Roberts v. The Huntsville, Fed. Cas. No. 11,904, and The Madgie, 31 Fed. 928, followed. The Menominie, 36 Fed. 197, and The Thomas Sherlock, 22 Fed. 253, distinguished.

4. **Same—Sale Under—Surplus—Apportionment of—Receiver's Certificates.**
   Where a vessel has been sold to pay maritime liens, the district court will not adjudge the surplus to or apportion it between the holders of receiver's certificates issued by the receiver of the owner of such vessel, appointed by a state court of another state, even though such court has decreed that the certificates shall be first liens upon the vessel, and paramount to other liens upon the property of the owner.

5. **Same—Disposition of—State Courts—Suspension of Jurisdiction.**
   Where a state court has obtained legal possession of a vessel in foreclosure proceedings against the owner thereof, and a receiver has been appointed, the seizure and sale of such vessel by the district court to pay maritime liens merely suspends the action of the state court as to the surplus arising from such sale, and such surplus will be paid over to the receiver, as the officer of the state court, for distribution.

The steamship Willamette Valley, formerly owned by the Oregon Pacific Railroad Company, having been sold to satisfy various

maritime liens proved against her, the receiver of the company petitioned the court for the surplus proceeds. Counter petitions were also filed by several creditors of the Oregon Pacific Railroad Company.

This corporation was insolvent, and, by virtue of a certain action to foreclose a mortgage held against it by the Farmers' Loan & Trust Company, instituted in the circuit court of the state of Oregon, in and for Benton county, all of its property, including the steamship Willamette Valley, was placed in the possession and under the control of a receiver appointed and acting under the orders of that court. Subsequently the road and property of the company were sold to satisfy the decree of foreclosure, and, upon confirmation of the sale, the then acting receiver, Charles Clark, was discharged, and exonerated from his trust, except as to this surplus fund, which he now seeks to obtain as against the claims of these various creditors. These claims are as follows: (1) That of W. A. Swinerton, who petitions to have a common-law judgment, which he obtained in the courts of this state, satisfied out of the surplus. (2) That of A. J. Storrs, the master, who claims his wages as such by virtue of certain services rendered as pilot of the steamship. (3) That of the sureties given to secure the release of the steamship when she was first libeled, by reason of which they had to pay the decree and costs. They also ask for an allowance for counsel's fees. (4) Several holders of receiver's certificates, claiming a lien on the vessel, also petition to be given priority over other petitioners, and to be awarded the surplus in full or partial satisfaction of their demands. Surplus awarded to the receiver, and the counter petitions dismissed; all costs to be first deducted from the surplus.

Page & Eells, for petitioner Charles Clark, the receiver.

John H. Dickinson and Walter G. Holmes, for petitioner W. A. Swinerton.

Wal. J. Tuska, for J. Levi, Sr., and E. W. Ferguson

Rothchild & Ach, for petitioner George F. Lowrie.

S. C. Houghton, for several insurance companies.

Andros & Frank, for petitioners William L. Law and A. J. Storrs.

MORROW, District Judge. The steamship Willamette Valley was seized under process issuing from this court at the suit of the above-named libelant, to enforce a maritime lien for supplies furnished the vessel. Previous thereto she had been arrested upon the libel filed by one Patrick Gleeson, seeking to recover damages incurred while a passenger on board of said steamship, but had been released upon a bond given to the United States marshal under the provision of section 941 of the Revised Statutes. Other libels in rem were also thereafter filed against the vessel to satisfy various maritime liens, but she was not released upon these subsequent claims, nor upon the one involved in this case. During the pendency in this court of these claims the steamship was sold upon the petition of the libelant, and after a satisfactory showing had been duly made under general admiralty rules 10 and 11. The receiver, it appeared, could neither make a deposit nor give the required stipulation for the vessel's release, and it further satisfactorily appeared that the machinery of the vessel, in her then idle and unused condition, was rusting, her woodwork drying and cracking, and every part showing general deterioration and decay. See opinion of court, 63 Fed. 130. All of the maritime liens originally entered against the vessel having been satisfied, the present proceedings are

directed to the disposition to be made by the court of the surplus now remaining in the registry.

When the steamship Willamette Valley was first seized, and, in fact, also upon the subsequent seizures, the receiver of the Oregon Pacific Railroad Company, appointed and acting under the authority of the state court of Oregon, which had assumed jurisdiction and control of the property of the Oregon Pacific Railroad Company by virtue of certain foreclosure proceedings instituted against that corporation, appeared, and claimed the steamship as the property of the company. He excepted to the jurisdiction or right of the court to proceed against the vessel on the ground that she was under the management, control, and possession of the receiver of a foreign jurisdiction, viz. the state court of Oregon; that she was, therefore, in custodia legis, and that such possession could not be interfered with by this court, unless the consent of the state court of Oregon, whose officer the receiver was, were first obtained. The same exception was raised to each libel, and they were consolidated for decision on that question. After very full argument and thorough consideration, this court held that the admiralty law, in the enforcement of maritime liens, is paramount within its jurisdiction; that it was immaterial, so far as this jurisdiction was concerned, whether the vessel was under the control and management and in the possession of a receiver appointed by the state court of Oregon; that admiralty liens would nevertheless attach; and that only considerations of comity will prevent a court of admiralty from maintaining its supremacy. It was further held that these principles of comity did not apply to the case at bar for the reasons: First, that the cause of action under consideration arose in this jurisdiction; second, that the vessel, at the time the liens were incurred, was engaged as a common carrier in trade and commerce; third, that the proceedings were in rem; and, fourth, that the state and federal courts were not, in this instance, of co-ordinate or concurrent territorial jurisdiction. 62 Fed. 293. An appeal was taken from this ruling to the circuit court of appeals, where the decision of this court was affirmed, and the case remanded for further proceedings upon the merits. 13 C. C. A. 635, 66 Fed. 565. Further proceedings were thereupon had, and, after satisfying all the maritime liens pending against the steamship, there now remains a surplus of $23,950.85 in the registry. Seven petitions or interventions against this surplus have been filed. They may be classed as follows: (1) That of Charles Clark, the present receiver of the Oregon Pacific Railroad Company in the state of Oregon. This petitioner claims all of the surplus on the ground that, as all the maritime liens have now been satisfied, this court has no further power or right, sitting as a court of admiralty, to pay over the surplus to any one except the receiver himself. (2) That of Jacob Levi, Sr., and E. W. Ferguson, to be paid a certain sum which, as sureties for the release of the Willamette Valley upon the first libel filed against her in this court by Patrick Gleeson, they were compelled to pay by virtue of the decree of this court duly entered in favor of the libelant Gleeson,—the sum of $300 and costs. The aggregate of the decree

and costs amounts to $437.88. They also petition for the additional sum of $400, to be allowed for counsel fees to the proctor who defended the claim. (3) That of W. A. Swinerton, who claims a lien by reason of a judgment at common law recovered by him in the courts of this state within this district. The judgment consists of the sum of $15,368.78 principal and interest, and $1,115.95 costs. (4 and 5) The petitions, respectively, of William L. Law and George F. Lowrie, holders of certain receiver's certificates issued by and under the authority of the state court of Oregon, having jurisdiction of the foreclosure proceedings, and alleged to constitute a first lien on the steamship Willamette Valley. (6) The petition of several insurance companies, holders of receiver's certificates received by them in payment of their premiums upon certain policies of insurance covering the entire property of the Oregon Pacific Railroad Company, and purporting to constitute a lien prior to all others. (7) The petition in intervention of A. J. Storrs for wages as master and pilot. The petitioners have excepted and answered each other's claims, and they will all be considered together.

The important question to be determined is whether this balance should be turned over to the receiver, as the representative of the owner, or whether any of the other petitioners or interveners have a superior right to be paid out of the surplus. This question depends, obviously, upon the character of the claims presented. But, in order to be entitled to recognition at all by a court of admiralty in distributing surplus proceeds derived from the sale of a vessel seized to satisfy maritime liens, these claims must possess certain qualities. In the first place, they must be vested interests in the fund. This is the meaning given by the supreme court to the language of the forty-third rule, which reads: "Any person having an interest in any proceeds in the registry of the court, shall have a right by petition and summary proceeding to intervene pro interesse suo, for a delivery thereof to him." Schuchardt v. Babbidge, 19 How. 239; The Lottawanna, 21 Wall. 558; The Albert Schultz, 12 Fed. 156. In the second place, as against the claim of the owner, contesting claimants must have a lien, legal or equitable. As said in the Albert Schultz, supra: "In the distribution of the funds which form a residuum in the registry, courts of admiralty recognize legal titles and legal and equitable liens." In The Edith, 94 U. S. 523, it is said: "The court [of admiralty] can marshal the fund only between lienholders and owners." In the third place, this lien must be specific, not general. See the cases cited above, particularly The Lottawanna, 21 Wall. 558; also, The Peerless, 45 Fed. 493; The Balize, 52 Fed. 414. All the maritime claims involved in this case and in the other libels filed against the Willamette Valley having been paid out of the proceeds of sale, the purposes for which the court originally assumed jurisdiction may be said to have been fully consummated. That the court, however, in having assumed jurisdiction for one purpose, has the inherent power to dispose of the case for all purposes connected with a rightful distribution of the fund in its possession, is well settled. "It must do something with the fund. It is absurd to suppose that it cannot." The E.

V. Mundy, 22 Fed. 173. Its controlling desire, in this direction, is to ascertain who is or are the rightful claimants or owners of the surplus. In determining who are entitled to the remnants, it must necessarily pass upon and recognize, in many cases, claims foreign to its jurisdiction, and of a nonmaritime character. It has been said that in this respect it acts as a court of equity, but this is not correct. It merely acts upon equitable principles, to see to it that the fund is justly distributed to him to whom it rightfully and legally belongs. As is aptly explained by Judge Billings in The Albert Schultz, 12 Fed., at page 156:

"This court, as a court of admiralty, has no equitable jurisdiction. It is often said to be a court of equity. The meaning of that expression is that it is a court which is not governed by artificial or technical rules or mode of procedure, and therefore it acts with the spirit of the purest equity and good conscience; but it cannot change the legal relations of parties to property, as can a court of chancery."

Nor is it a court of bankruptcy, or a court endowed with power to apply the property of an owner to the payment of claims held by his general creditors. Those who petition for the surplus or a portion of it must show a "vested interest" in the fund, and this means, generally speaking, a title to it derived from the owner, or a specific lien, either legal or equitable, of such a character as to be deemed superior to the preferred right of the owner. That the owner of the surplus has a preferred right to it is distinctly recognized by the supreme court of the United States in The Lottawanna, 20 Wall. 201, 221, where the court clearly enunciated the doctrine of distribution to be followed by courts of admiralty in distributing surplus proceeds. The opinion is written by Mr. Justice Clifford, and the language upon this proposition is as follows:

"Beyond doubt, maritime liens upon the property sold by the order of the admiralty court follow the proceeds, but the proceeds arising from such a sale, if the title of the owner is unincumbered, and not subject to any maritime lien of any kind, belong to the owner, as the admiralty courts are not courts of bankruptcy or of insolvency, nor are they invested with any jurisdiction to distribute such property of the owner, any more than any other property belonging to him, among his creditors. Such proceeds, if unaffected by any lien, when all legal claims upon the fund are discharged, become, by operation of law, the absolute property of the owner. * * * Decided cases may be found which afford some support to the proposition that the proceeds in the registry of the court, if the lien claims are all discharged, may be distributed equitably among the intervening creditors of the owners; but the court is of the opinion that the rule that the proceeds in that state of the case belong to the owners is correct in principle, and that the weight of authority is in its favor, notwithstanding those cases of which The John, 3 C. Rob. Adm. 290, is the one most frequently cited. But in that case there was no opposition by the owners, nor was the question much considered. Directly opposed to that case is the case of The Maitland, 2 Hagg. Adm. 253, in which the admiralty court refused to follow it, remarking that there is no solid distinction between original suits and suits against the proceeds, where there is opposition. Mere remnants, if unclaimed by the owner, may stand upon a different footing, and it is upon that ground that the admiralty courts have sometimes decreed the payment of small unclaimed sums to a creditor of the owner having a clear equity, to prevent the same from being indefinitely impounded in the registry of the court. Exactly the same point was decided in the same way in the case of The Neptune, 3 Knapp, 111, in which all of the authorities to that time were carefully examined. Where the ship is sold, the

proceeds are in the hands of the court, which holds the fund in trust; and the court in the following case added that the owner is in some sense entitled to the same, but finally decided that, inasmuch as he cannot obtain the fund without the order of the court, that it cannot be attached under the garnishee process. The Wild Ranger, Brown. & L. 88. * * * Different views have in some few instances been adopted by the district courts, but the right of the court to decree that third persons who could not have proceeded against the property in rem may recover a proportion of the proceeds to satisfy their claims against the owner, in a case where the owner appears and opposes the application, seems to be repugnant to every sound principle of judicial proceeding, and it is certainly opposed to the great weight of authority."

In the case of The Lottawanna, 21 Wall. 558, which was another and a later, but an entirely independent, proceeding in rem against that vessel, the question again came up. The vessel was again sold by order of court, and, the maritime liens for which she had been seized having all been satisfied, the question arose, among others, as to the priority of claim to the surplus fund between the mortgagee and the owner of the vessel. Mr. Justice Bradley used the following language in this connection:

"But there is another mode in which the appellees, if they had a valid lien, could come into the district court, and claim the benefit thereof, namely, by a petition for the application of the surplus proceeds of the vessel to the payment of their debts, under the forty-third admiralty rule. The court has power to distribute surplus proceeds to all those who can show a vested interest therein, in the order of their several priorities, no matter how their claims originated. Schuchardt v. Babbidge, 19 How. 239. The propriety of such a distribution in the admiralty has been questioned on the ground that the court would thereby draw to itself equity jurisdiction. The Neptune, 3 Knapp, 111. But it is a wholesome jurisdiction very commonly exercised by nearly all superior courts, to distribute a fund rightfully in its possession to those who are legally entitled to it, and there is no sound reason why admiralty courts should not do the same. If a case should be so complicated as to require the interposition of a court of equity, the district court could refuse to act, and refer the parties to a more competent tribunal. In this case the appellants themselves have no maritime lien, but merely a mortgage to secure an ordinary debt not founded on a maritime contract. They therefore have no standing in court, except under the forty-third admiralty rule, and in the manner above indicated. Their libel was inadmissible, even under the admiralty rule as recently modified. The John Jay, 17 How. 399. But before the final decree they filed a petition for the surplus proceeds, and, as there is no question in the case about fraudulent preference under the bankrupt law, they are entitled to those proceeds towards satisfaction of their mortgage."

The effect of the decision is to recognize that a mortgagee of a vessel holds such a "vested interest" in the surplus proceeds to entitle him, as against the owner, to be paid out of the fund. In the case at bar, no mortgagee has appeared to claim satisfaction of his mortgage out of the surplus. See, to same effect, The Advance, 63 Fed. 704; Henry, Adm. Jur. & Proc. 334–336. In a later case in the supreme court—The Edith, 94 U. S. 523—this language is used:

"It need hardly be added that, though a proceeding in rem and a petition for payment of a claim out of proceeds of a sale remaining in the registry are distinct things,—the former proceedings on the ground of a lien,—yet no one except an owner is entitled to payment out of the registry, unless he has a lien upon the fund thereon. The court can marshal the fund only between lienholders and owners."

From the above language of the supreme court in the several cases quoted from it is apparent that, in the distribution of surplus pro-

ceeds, a distinction is clearly drawn between a case where the surplus remains unclaimed by the owner and a case where the owner does come in and claim the balance of proceeds.    In the former instance it is manifest that the court of admiralty, if it is to dispose of the fund at all, must often recognize, in the absence of better rights, purely equitable claims and ordinary debts; otherwise it might result that the fund would be indefinitely impounded in the registry.    The court, in such a case, proceeds upon the equitable idea that, in the absence of the owner, or of one holding a legal or equitable lien upon the fund, it will award the surplus to him who can show the best right to it.    But when the rightful owner appears, and claims the surplus, the court is in duty bound to award it to him, unless it appears satisfactorily that opposing claimants have a vested interest therein, which the court should recognize as superior to the owner's prior claim.    Our first concern, therefore, is to ascertain whether any of the petitioners have any vested interest in the surplus as against thereceiver, who, to all intents and purposes, represents the owner on behalf of the state court of Oregon, whose officer he is.

Taking up the petition of W. A. Swinerton first, for the amount of a judgment recovered by him in the state court within this district, and consisting of $15,368.78 principal and interest and $1,-115.95 costs, I am of the opinion that he has no lien which this court can recognize.    His claim is really a judgment upon a judgment. The original judgment was recovered in the circuit court of the United States for the district of Oregon against the Oregon Pacific Railroad Company.    The property of that corporation having been placed in the hands of a receiver by reason of the foreclosure proceedings instituted against it, and being insufficient to satisfy this judgment, with the numerous other claims pending, an assignment of the judgment was made to the petitioner as a citizen of this state, who thereupon brought suit and obtained judgment upon the judgment recovered in the state of Oregon, with the object in view of levying execution upon the proceeds of sale of the Willamette Valley as the property of the insolvent corporation, after all maritime liens had been satisfied.    Execution process was duly issued and served upon the marshal of this court, purporting to levy upon the steamship Willamette Valley, as property belonging to the Oregon Pacific Railroad Company.    Petitioner Swinerton claims that his judgment and execution constitute a lien, or at least a quasi lien, on the surplus proceeds.    But the contrary is well established.    It was authoritatively settled so long ago as Taylor v. Carryl, 20 How. 583, that property in the custody of an officer of a federal court is exempt from process or interference by authority of a state court of the same co-ordinate or concurrent territorial jurisdiction.    It is claimed, however, that the levy was not strictly upon the vessel itself, but upon all the right, title, and interest of the owner of the vessel, and that this interest was not capable of manual delivery; that, therefore, subdivision 3 of section 542 of the Code of Civil Procedure of California, which requires that attachments of personal property shall be effected by taking the same into custody,

is inapplicable; but that subdivision 5 of said section applies, which provides that "debts and credits, and other personal property, not capable of manual delivery, must be attached by leaving with the person owing such debts, or having in his possession, or under his control, such credits and other personal property, or with his agent, a copy of the writ, and a notice," etc. But this contention, even if it be sound,—which I doubt,—cannot avail the petitioner, for a common-law judgment of a state court, though accompanied with an attempted levy of execution, does not constitute such a lien which a court of admiralty will recognize in distributing a surplus as against the claim of the owner. This was passed upon in The Lottawanna, 20 Wall. 201. In that case it appeared that the appellees claimed the whole fund in the registry as against the owners. They had had something to do with the vessel, and had sued its owners, and obtained judgment against them in one of the state courts of Louisiana. On this judgment they issued execution and attached the funds in the registry of the district court. They also had decrees in personam against the owners in the admiralty. The district court decided that the fund should be paid to the sheriff, to answer the process issued in the suit in the state court against the owners, and dismissed the latter's intervention against the proceeds. The circuit court, on appeal, affirmed the judgment of the district court. The supreme court reversed this ruling, and said:

"It is contended that the appellees acquired the right of preference in the fund by virtue of the proceedings under the garnishee process, as more fully set forth in the record; but the court is entirely of a different opinion, for several reasons: (1) Because the fund, from its very nature, is not subject to attachment either by the process of foreign attachment or of garnishment, as it is held in trust by the court, to be delivered to whom it may belong, after hearing and adjudication by the court. The Albert Crosby, 1 Lush. 101; The Wild Ranger, Browning & L. 84; 1 Chit. Archb. (11th Ed.) 702. (2) Because the proceeds in such a case are not by law in the hands of the clerk nor of the judge, nor is the fund subject to the control of the clerk. Moneys in the registry of the federal courts are required by the act of congress to be deposited with the treasurer of the United States, or an assistant treasurer or designated depositary, in the name or to the credit of such court; and the provision is that no money deposited as aforesaid shall be withdrawn except by the order of the judge or judges of said courts respectively, in term time or vacation, to be signed by such judge or judges, and to be entered and certified of record by the clerk. 17 Stat. 1. Regulations substantially to the same effect have existed in the acts of congress for more than half a century, and within that period it is presumed that no proceeding to attach such a fund by a creditor of the owner has ever been sustained. 3 Stat. 395. (3) Judgments were never a lien upon personal property, unless made so by attachment under mesne process, which is all that need be said in respect to the proposition that the appellees acquired a right of preference to the proceeds in the registry of the court by virtue of their judgment against the owners."

The second reason assigned—that the clerk has no control of the fund in the registry of the court—is directly applicable to the position of the marshal. While it is true that he has the physical control and possession of the vessel, still such custody is simply by virtue of the fact that he is the ministerial officer of the court, and such custody is none the less the court's. Furthermore, the third reason given, viz. that "judgments were never a lien upon personal property, unless made so by attachment under mesne process," is conclusive against the attempted garnishment in this case. In The Balize, 52 Fed. 414,

Judge Jackson, then circuit judge, subsequently associate justice of the supreme court, in denying that the master of the Balize and the masters of other boats owned by the Detroit Tug & Transit Company had any lien upon the surplus fund as against the owner, although they had severally obtained judgments in personam against the Detroit Tug & Transit Company, on which executions had been issued to the marshal, and by him returned nulla bona, said:

"The judgments which the several masters have obtained against the Detroit Tug & Transit Company in personam, the issuance of executions, and returns of nulla bona thereon, created no lien on said surplus. The suits and judgments in personam conferred no vested right to a specific interest in said surplus, such as the forty-third admiralty rule contemplates. The creditor who claims satisfaction out of surplus proceeds in such cases must come into court with an existing specific lien. He cannot invoke the aid of a court of admiralty to create such lien by attaching or impounding the fund. The admiralty court can only enforce or give effect to subsisting liens created by statute or contract as against the owner of surplus proceeds."

Counsel for petitioner rely particularly upon the case of The Daniel Kaine, 35 Fed. 785, 787. That authority does support their contention that petitioner Swinerton has a lien on the surplus by virtue of his judgment and execution issuing from the state court. But I cannot recognize that case as binding authority in the face of the decision of the supreme court in The Lottawanna, supra. The petition of Swinerton will, therefore, be dismissed.

The next petition to be considered is that of A. J. Storrs, who claims for services rendered as master and pilot of the Willamette Valley. The commissioner reports that there is owing this petitioner, as master and pilot, the sum of $400,—$200 for the month of December, 1893, and $200 for the month of January, 1894,—and he refers the question of law to the court as to whether the petitioner has a lien upon the vessel, or the fund derived from its sale, as pilot and not as master. That the petitioner has no lien as master is well established. The Orleans v. Phoebus, 11 Pet. 175; Willard v. Dorr, 3 Mason, 91, Fed. Cas. No. 17,679; The Grand Turk, 1 Paine, 73, Fed. Cas. No. 5,683; The Imogene M. Terry, 19 Fed. 463; Fisher v. Willing, 8 Serg. & R. 118; The Favourite, 2 C. Rob. Adm. 232. See, also, in the circuit court of appeals for this circuit, The Louis Olsen, 6 C. C. A. 608, 57 Fed. 845. It appears from the testimony taken before the commissioner that the petitioner acted in the dual capacity of master and pilot for the bars of San Francisco and Yaquina Bay. The general superintendent of the Oregon Pacific Railroad Company, the corporation to which the Willamette Valley formerly belonged, testified that he made the petitioner master of that vessel principally for the reason that he was a licensed pilot for San Francisco bar, and could, in that capacity, save to the steamship $520 per month; and he also stated that the amount of wages agreed to be paid,—i. e. $200 per month,—was in excess of what would have been paid to a master who held only a master's license, and not, also, a pilot's license. But can a master of a vessel, who holds a pilot's license, and renders services as such, claim a lien for his entire wages as master on the theory that he has a lien as pilot? I hardly think such a claim will avail to nullify the strict and old doctrine of admiralty law that the master

has no lien. If this court should now declare, for the first time, that masters, who are also licensed pilots for places to and from which they travel, and who as such, incidentally and in connection with their primary duties as master, perform pilotage services to their own vessels, are thereby entitled to a lien for their whole wages as masters upon the theory that they are pilots of the vessels they command, this would be to establish a precedent which, if followed, would do away with the heretofore strict rule to the contrary. It would amount, practically, to judicial legislation in favor of the master's lien. It may be that, if the services rendered as master and as pilot can be satisfactorily segregated, the master would be entitled to a lien for the services he renders his vessel distinctively as pilot. In this case, no such segregation has been proved. The allegations of the petition show that he claims his entire wages as master and pilot. But, however that may be, I am inclined to the opinion that, in this instance, the master impliedly waived whatever lien he had as a pilot by acting as master. It was testified that the excess of wages he received was by virtue and in consideration of his possessing competent qualifications as a pilot. While it may be true that his qualifications as a pilot rendered him a more desirable and valuable master, still that fact is not, intrinsically, of sufficient force to justify me in declaring him entitled to a lien as master. Such duties as he did render as pilot appear to me to have been incidental and subordinate to his duties as master. In The Balize, supra, the master had secured a judgment in personam against the owner for his wages. Execution was returned nulla bona. He then petitioned to be allowed the amount of his decree out of the surplus funds derived from the sale of the vessel he had commanded. It is true that no question of pilotage arose in that case, but the general language employed by Judge Jackson indicates the trend of judicial opinion respecting the claims of masters for the payment of their wages out of surplus proceeds. That learned judge says:

"After a careful examination of the questions presented by the appeal, I am satisfied, contrary to my first impressions, that the action of the district court in allowing and directing the debt of Ames, the master of the Balize, to be paid out of the surplus, is erroneous. This allowance was no doubt made upon the authority of The Santa Anna, Blatchf. & H. 80, 81, Fed. Cas. No. 12,325, where it was held that the master, as against the owner, was entitled to payment out of a surplus remaining in court. But that case has been practically overruled by the supreme court of the United States in the case of The Lottawanna, 20 Wall. 201, 21 Wall. 559, which held that surplus proceeds, in such cases as the present, must be paid over to the owner, unless claimed by a creditor having a specific lien thereon, either by contract or statute. * * * Neither the master of the Balize nor any of the other petitioning creditors had any specific lien upon the Balize or its proceeds, either by statute or contract."

And the learned judge thus concludes:

"It may be, and doubtless is, inequitable for the owner to assert its right to this surplus, and leave bona fide debts unpaid; but a court of admiralty has no such equitable jurisdiction as will enable it to correct such a wrong. The claim of the master of the Balize cannot be distinguished from that of other creditors, and the decree of the district court allowing and directing its payment is reversed."

The petition of Storrs will be dismissed.

The next claim to be considered is that of the sureties to the bond given for the release of the Willamette Valley when she was first libeled in this court. The vessel was proceeded against by one Patrick Gleeson, who sued for damages sustained while a passenger on board of said steamer. The sureties, at the instigation of the then acting receiver, and upon receiving a written guaranty from him upon the order of the state court of Oregon that they should be held harmless from any damage or judgment that might result by virtue of their having executed the said bond, gave their bond in the sum of $10,000, under section 941, Rev. St. The order of that court, made on October 13, 1893, recites that:

"Said bond or undertaking was executed by the said Messrs. Levi and Ferguson at the request of the receiver of the defendant properties, so that the said S. S. Willamette Valley should not be tied up, and her services lost to the receiver; and that the said S. S. Willamette Valley is very necessary in the operation of the defendant properties in carrying the grain and merchandise to and from San Francisco, California, and is producing more revenue than any other branch or part of the defendant's system."

The sureties, it seems, employed an attorney to resist said claim, who ably contested it. Largely through his efforts, the claim for damages was considerably reduced, this court finally allowing the sum of $300 to the libelant, Gleeson. See opinion of court, 71 Fed. 712. This decree the sureties paid, amounting, with costs, to $437.88. They now petition to be reimbursed for this sum; and also ask for the additional sum of $400 as counsel fees for the attorney who represented the company. It seems that they have already petitioned the state court of Oregon, where the foreclosure proceedings were pending, for the allowance of these amounts. The final report, and the decree of that court of February 26, 1896, confirming the report, at pages 165, 166, shows that the sureties did present their claim for judgment, costs, and counsel fees to that court, and that the same was allowed and ordered paid in the sum of $463.35, this being fixed as the amount of decree and costs; but the sum of $579, claimed for counsel fees, witness' fees on the part of the defendant, and the taking of depositions of witnesses, was disallowed. It further appears, from said final report and the order confirming the same, that the claim of the sureties, to the extent allowed, was made a preferred claim, even over the receiver's certificates, and that there were then sufficient funds to pay the same. But the sureties, desiring their claim to be allowed in full, including the counsel fees, witness fees, etc., have petitioned this court to be paid from the surplus proceeds in the registry. That their claim does not constitute a lien, and consists simply of a personal claim against the claimant, is well settled. Carroll v. The Leathers, 1 Newb. Adm. 432, Fed. Cas. No. 2,455; Roberts v. The Huntsville, 3 Woods, 386, Fed. Cas. No. 11,904; The Madgie, 31 Fed. 928. In the first of these cases, McCaleb, district judge, used the following significant language:

"The surety, therefore, can only be regarded in the light of an ordinary creditor of his principal, upon whose personal credit he relied when he bound himself for the payment of the bond. His right to be paid out of the proceeds of the boat which has been sold under his execution must be regarded as subordinate to the claims of the interveners who have established their liens. If any injury shall eventually accrue to him in this case, the court can only express regret at its in-

ability to relieve him. It is his own fault if he has failed to exact of his principal a separate stipulation to indemnify him against all loss. And although the rules are silent with regard to this form of stipulation, yet, as a familiar and well-established part of the civil law and general admiralty practice, the court would not have hesitated, upon his application, to direct it to be given. Conk. Adm. 462, 463. He has the same right to proceed against the boat which has been seized and sold in this case as against any other property belonging to his principal; but it is the right of an ordinary, and not of a privileged, creditor holding a lien."

The case was affirmed on appeal to the circuit court. See note to the case in Fed. Cas. No. 2,455, supra. In the case at bar the sureties were indemnified with a written guaranty that they should be saved harmless and be protected. That they have an equitable claim as against these proceeds derived from the sale of the vessel whose release they secured when she was first libeled, and that their equity in this respect is of a high character, cannot be doubted. They did a meritorious act, and should be reimbursed for all reasonable and legitimate expenditures made by them in that behalf. Much as I should like to allow their claim as against the surplus, I feel constrained under the peculiar circumstances of this case, though with considerable reluctance and much against my own personal wishes, to deny their petition, and advise them that it be presented to the state court of Oregon, where, I have no doubt, the matter, if properly presented, will be justly dealt with. The sureties certainly deserve to be paid, but, under the circumstances of this case, and in view of the other claims pending against this fund, I do not feel that the equitable powers of this court can be stretched far enough to allow this claim; particularly that part which relates to counsel fees. The whole matter, it seems to me, properly belongs to the state court of Oregon, under whose authority the receiver of that court gave these sureties an indemnity guaranty. Counsel for the sureties relies greatly on The Menominie, 36 Fed. 197. There the facts were that the petitioner advanced money at the request of the master to relieve the boat from an actual seizure then existing, and to prevent the loss and damage that would have been occasioned to all had the boat been detained in the custody of the marshal. The vessel was in a foreign port, and she was seized for supplies (coal) furnished her. The court held that, under the peculiar circumstances of that case, and in view of the very strong equities that attached to the intervener's claim, he was entitled to a lien. The general language used and the equitable principle applied in that case is, undoubtedly, strong authority for the allowance of the claim to the sureties made in this case, but there is a distinguishing feature between the cases, which is conclusive against the sureties in the case at bar. In The Menominie money was advanced to release the vessel; in other words, the claim for the coal was satisfied. By the admiralty law, money advanced to a master to enable him to purchase supplies at a foreign port gives one a lien therefor upon the vessel. Thomas v. Osborn, 19 How. 22; The Emily Souder, 17 Wall. 666; The Lulu, 10 Wall. 192; The Neversink, 5 Blatchf. 539, Fed. Cas. No. 10,133; The Mary, 1 Paine, 671, Fed. Cas. No. 9,187; The Ole Olesen, 20 Fed. 384. Henry, in his work on Admiralty, thus states the rule:

"The lender of money, or the person making advances to the master to supply the ship's necessities in a foreign port, has the benefit of the same lien which would attach for the supplies furnished and paid for through the money raised for that purpose, and with the same rank. The privilege of the material man who supplies a foreign ship extends to the creditor who advances money for the purchase of necessaries and to advances for the payment of an already existing debt for necessaries,"—citing The Tangier, 2 Low. 7, Fed. Cas. No. 13,744; The Thomas Sherlock, 22 Fed. 253.

Again, the author says:

"All advances of money made to pay off claims of a maritime nature upon the credit of the vessel, which are liens in the admiralty, have the benefit of the lien with the same rank as the original claims, and it has been extended to subsequent loans to pay off previous advances for such purposes."

In the case at bar the sureties became obligated on a bond for the release of the steamship, receiving an indemnity bond from the receiver therefor. They advanced no money. The same observation is true with respect to The Thomas Sherlock, 22 Fed. 253, also cited by counsel. There money was actually advanced at the outset. I do not wish to be understood as laying down a general rule that under no circumstances can sureties recover from the surplus proceeds, but I think that under the peculiar circumstances of this case, the court in Oregon should pass upon the claim, and I shall, therefore, dismiss the petition of the sureties.

We come now to the three petitions for the allowance of receiver's certificates. These can be considered together. I am asked by the petitioners to allow these certificates, as against the opposition of the receiver; and, further, I am requested to marshal them between the several petitioners, those held by the various insurance companies being claimed to constitute a prior lien to those held by the other petitioners. Petitioner William L. Law presents 14 receiver's certificates for allowance, amounting to $28,000, with interest from the 1st day of March, 1891, at the rate of 8 per cent. per annum. Petitioner George F. Lowrie presents four receiver's certificates, aggregating the sum of $40,000, comprising part of the same issue to which Law's certificates belong. He also claims interest at the rate of 8 per cent. per annum from March 1, 1891. The certificates held by both these petitioners were issued under the following circumstances, as appears from the orders and proceedings of the state court of Oregon in the foreclosure of the mortgage held by the Farmers' Loan & Trust Company, which were introduced in evidence: Upon the institution of the proceedings to foreclose, T. E. Hogg was appointed receiver by the court, and took possession and control, subject to the orders of the court, of all the property and business of the insolvent railroad corporation. During the pendency of these proceedings, and before a sale of the mortgaged property, the receiver, who was also the owner of the steamship Willamette Valley, sold her to the corporation, the purchase being authorized by the court. It appears that the vessel was one of the principal sources of revenue to the corporation, connecting with the railroad at Yaquina, and making trips backward and forward between the latter place and San Francisco. In order to pay for said vessel, the court, by its order and decree of February 12, 1891,

as amended by the subsequent order of February 28, 1891, authorized said receiver to borrow the sum of $180,000, and to issue receiver's certificates therefor, of the same form, and maturing at the same time, and bearing the same rate of interest, as certificates theretofore issued. It was also decreed that this issue of certificates should constitute a first lien upon the steamer Willamette Valley, and a further lien upon the entire property of the railroad companies, which should be prior and paramount to the lien of the plaintiff, the Farmers' Loan & Trust Company, or of the holders of any of the bonds secured by the plaintiff's mortgage. It was further directed that from the proceeds of such certificates the amount of $150,000 should be applied in payment of the indebtedness of the said railroad companies to said receiver, Hogg, to secure which the steamer was pledged to him; said Hogg to release said steamer to the railroad companies upon the issuing of such certificates in the sum just mentioned, and the balance of $30,000 to be applied to the liquidation of all claims and demands against the steamer for supplies, wages of employés, and other kindred matters. The receiver was also authorized in and by this same order and decree to issue additional certificates to an amount not exceeding $70,000, to be secured by lien upon the entire property of the insolvent corporations; the proceeds of the same to be applied from time to time to the extinguishment of divers and sundry claims, constituting liens prior to the lien of the mortgagee, and for operating expenses, etc. It was further ordered, adjudged, and decreed that the railroad companies execute a mortgage of further assurance to the mortgagee, the Farmers' Loan & Trust Company, covering the steamer Willamette Valley, under the clause of further assurance set forth in the original indenture of mortgage or deed of trust executed by the Oregon Pacific Railroad Company on October 1, 1880. So far as such the records of the proceedings as were introduced in evidence disclosed, all these matters were carried out. The vessel became the property of the company, subject to the mortgage held by the plaintiff in the foreclosure proceedings, by virtue of the mortgage for further assurance executed April 15, 1891. Her subsequent seizure under process from this court, and her sale to satisfy maritime liens, gave the purchasers a title freed from all incumbrances, so far as the insolvent companies or the mortgagee was concerned. But the surplus proceeds stand upon a different footing. It is primarily the property of the insolvent companies.

The position of the various insurance companies holding receiver's certificates is as follows: On April 26, 1893, the court made an order authorizing the then acting receiver, E. W. Hadley, to issue receiver's certificates to the amount of $15,100 for the purpose of paying premiums upon insurance then placed upon the properties of the defendant corporation, including the steamship. The order recites that the certificates issued should have priority over all certificates theretofore issued, of whatever nature or kind, and that the said certificates recite such priority upon their face. As the aggregate of all the receiver's certificates presented by these several petitioners for allowance, and claimed to constitute liens upon

the steamship, and therefore also upon the surplus proceeds derived from the sale of the vessel, amounts to over $83,000, exclusive of interest, whereas the surplus itself amounts only to some $23,000, the court would, of necessity, have to determine—First, the character of lien claimed for these different issues of certificates; and, secondly, the priority between them. In other words, this court would have to assume the functions of the receiver's court in Oregon, with respect to these certificates. There are very strong and persuasive reasons why this court, as a court of admiralty, having only a special jurisdiction, should not usurp the prior and superior right of the state court of Oregon to determine the character and priority of alleged liens and claims made upon property involved in the foreclosure proceedings pending before it. In the first place, that court still retains jurisdiction of the foreclosure proceedings, so far as there may be any surplus. It is true that a sale of the property of the insolvent corporations to satisfy the mortgage has been decreed and effected, and the proceeds of sale marshaled and distributed in accordance with the orders of the state court of Oregon. But the very order of the court confirming the final report of the referee in discharging the receiver, Charles Clark, from the duties of his trust, contains the express reservation:

"Except as to the surplus fund, realized from the sale of the steamer Willamette Valley, now in the United States district court for the Northern district of California, and as to such fund his receivership is continued; and his bondsmen are hereby released and exonerated from all liabilities by and on account of being parties to the bond of the said receiver, Chas. Clark, to-wit, R. E. Gibson and P. Avery, and the other bondsmen, except as to any funds that may be hereafter realized by said receiver from said surplus fund aforesaid."

There is, therefore, a court of competent jurisdiction, fully adapted to meet and finally dispose of the intricate and complex questions connected with the marshaling of rival liens and claims, which are rendered more embarrassing in this case because the fund on hand is insufficient to meet all demands in full. It must not be forgotten, moreover, that it was that court which first obtained legal possession of the Willamette Valley as the property of the insolvent corporations proceeded against. The fact that this court took possession of the vessel while she was engaged in commerce between the state of Oregon and the state of California, being operated as a part of the road of the corporation, to satisfy maritime liens incurred by said vessel, and that in enforcing the same it sold her to pay them, did not affect or impair the prior equitable right of the state court of Oregon to the surplus proceeds. The proceedings in admiralty in this court simply operated to suspend, not to divest, the action or control of that court as to the surplus. This court assumed jurisdiction for the sole purpose of satisfying the paramount maritime liens, and to distribute the surplus to him to whom it rightfully and properly belonged. The purposes of admiralty jurisdiction having been consummated, the receiver, as the officer of the court of Oregon, now claims said surplus on behalf of that court. It is claimed that the receiver has no standing in this court, because he is without the territorial jurisdiction of the court which appointed him. Booth v. Clark, 17 How. 322; Brig-

ham v. Luddington, 12 Blatchf. 237, Fed. Cas. No. 1,874; Hazard v. Durant, 19 Fed. 471; Insurance Co. v. Needles, 52 Mo. 17; Moseby v. Burrow, 52 Tex. 396; Warren v. Bank, 7 Phila. 156; Insurance Co. v. Taylor, 2 Rob. (N. Y.) 278. While this undoubtedly is the rule, as a matter of strict right, still it is now generally held that he may, as a matter of comity, maintain suits in foreign courts. 20 Am. & Eng. Enc. Law, p. 242, and cases there cited. If the receiver is incompetent to represent in this jurisdiction, and apply, on behalf of the state court of Oregon, for the surplus proceeds to satisfy the claims of creditors in that jurisdiction, it is difficult to see how that court can ever be properly represented in a proceeding of this character. Aside from this, the receiver appeared as claimant of the vessel on behalf of the Oregon Pacific Railroad Company. Looking at the question from a practical standpoint, it is evident that the court of Oregon is, by reason of its previous proceedings in the foreclosure of the mortgage, and its familiarity with the whole history and details of that litigation, peculiarly fitted to dispose of the surplus proceeds as between these rival claimants, whether they hold a specific lien on the vessel, or a general lien on the property of the railroad, or have a purely equitable claim. It can marshal the claims presented to it according to the peculiar equities of the case, and in consonance, if need be, with purely equitable principles. It may be taken as conceded that these receiver's certificates could never have formed the basis of an original proceeding in admiralty against the vessel. But it is earnestly maintained that the holders of the certificates have a lien upon the surplus, all the maritime liens having been satisfied. In the view I take of the disposition to be made of this fund, it will not be necessary to determine what may be the nature of the lien, if any, which is claimed,—whether it is a specific lien on the vessel, which follows the surplus proceeds derived from her sale, or a general lien upon all the properties of the insolvent corporations. While a court of admiralty may deem itself authorized, under the peculiar circumstances of a special case, by reason of its possession of the surplus fund, to pass upon and determine claims based on receiver's certificates, still there can be no doubt that, in this case, the receiver's court, under whose authority the certificates were issued, should properly take charge of this surplus, and determine for itself the priority or pro rata to which the certificates may be entitled as against other and different pending claims. A convincing argument, tending to show the impropriety, if not the incompetency, of this court to deal properly with and marshal equitably the surplus as between these rival holders of receiver's certificates, and affording cogent reasoning why the state court of Oregon, whose receiver is now claiming the surplus, should take charge of the matter, is that in the final report of the referee, and in the order confirming that report, it appears that receiver's certificates were allowed in the sum of over $100,000. This did not include the claim of George Lowrie, who now presents certificates to the amount of $40,000, exclusive of interest. In the report of a former referee, filed January 13, 1892, and confirmed January 18, 1892, it appears that the sum total of receiver's certificates issued up to the 31st day of December, 1891, amounted to $638,041.29, exclusive of in-

terest. What has become of all these certificates cannot be ascertained from the record submitted to this court. Certain it is that, according to the final report made only last February, over $100,000 of these certificates were unpaid. All of these certificate holders are not now before the court. How can it, then, as to those whose claims were recognized in the final report of the referee and confirmed by the court in Oregon, proceed to a fair, just, and equitable distribution of this surplus? It is manifest that it cannot. It would be grossly inequitable for this court now to distribute the surplus between the holders of certificates who happen to be represented here, in the absence of others who only last February, in a regular and proper way, proved their claims before the receiver's court. The latter naturally look to that court for relief, and not to the court of a foreign jurisdiction. Why should they seek redress in this forum? This is not a court of bankruptcy or insolvency. It is not engaged in winding up the affairs of insolvent corporations, and foreclosing mortgages against them. There is another strong circumstance: The order confirming the final report of the referee finds, among other things, that, after paying certain preferred claims and expenses of proceedings, there will remain a balance of $22,073.17, and that the outstanding debts, including labor and material claims, attorney's fees, receiver's certificates (referring only to those proved at the final hearing), advertising, etc., would aggregate the sum of $341,971. It was estimated by the referee—and this estimate was confirmed by the court—that said balance of $22,073.17 would be .09846 on the dollar to be paid to each of the last designated creditors on the amounts found due in their favor. To order the surplus in the registry of this court to be apportioned among the certificate holders represented here, or perhaps to one of them, if he be deemed to have a priority over the others, would result in the certificate holders who had proved their claims in the regular and proper manner before the referee in Oregon getting only .09846 on the dollar, while the petitioners in this court would get much more. Such a division would certainly be inequitable and unjust. Aside from the fact that the receiver's court is the proper jurisdiction to which this surplus should be remitted, and where all claims against it can be regularly litigated, the supreme court, in The Lottawanna, 21 Wall. 558, 583, gave another reason upon which the district court could refuse to act in a case of this kind. It said: "If a case should be so complicated as to require the interposition of a court of equity, the district court could refuse to act, and refer the parties to a more competent tribunal." The facts and circumstances of the present proceeding seem to fully justify this court in availing itself of that rule. There certainly is no convincing reason why this court should now further retain jurisdiction of this surplus. It has fully accomplished the paramount purposes of admiralty jurisdiction. It has satisfied all the maritime liens presented in this forum against the vessel. Whatever reasons might exist in another case, and under different circumstances, to induce a court of admiralty to act upon equitable principles, and distribute a surplus to rival claimants as against the claim of the owner, I am not convinced that such reasons have been shown in this case. Such a determination

does not deprive any of the petitioners of their rights. They still have the privilege of presenting their claims in the state court of Oregon. The dismissal of their petitions in this court, it will be understood, is not intended to prejudice the validity of any of their claims. All of the creditors' petitions will, therefore, be dismissed. As they seem to have been presented in good faith, and as they are dismissed without prejudice, I have concluded to allow all costs upon their petitions to be paid out of the surplus proceeds. The entire surplus, less all costs, will be paid over to the receiver, Charles Clark, or to his proctors, to be paid by them to the circuit court of the state of Oregon in and for Benton county, where the foreclosure proceedings against the former owners of the vessel, so far as this surplus is concerned, are still pending. Let a decree be drawn up in accordance with this opinion